**LOEB & LOEB LLP**
Schuyler G. Carroll
William M. Hawkins
Evan K. Farber
Mary Jean Kim
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 407-4990
Email: scarroll@loeb.com
　　　　whawkins@loeb.com
　　　　efarber@loeb.com
　　　　mjkim@loeb.com

*Counsel to the Debtors*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | Chapter 11 |
| ) | |
| ) | Case No. 19-76260 (AST) |
| ) | Case No. 19-76263 (AST) |
| ) | Case No. 19-76267 (AST) |
| ) | Case No. 19-76268 (AST) |
| ) | Case No. 19-76269 (AST) |
| ) | Case No. 19-76270 (AST) |
| ) | Case No. 19-76271 (AST) |
| ) | Case No. 19-76272 (AST) |
| ) | |
| ) | (Jointly Administered) |
| ) | |

In re:

Absolut Facilities Management, LLC, *et al.*

Debtors.[1]

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

18555305

|  | ) |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| Absolut Facilities Management, LLC, et al., | ) |  |
|  | ) |  |
| Plaintiffs, | ) | Chapter 11 |
| v. | ) |  |
|  | ) | Adv. Pro. No. _____ |
| Mark LaSurk as Administrator of the Estate of | ) |  |
| Rhonda LaSurk | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |

## COMPLAINT

Absolut Facilities Management, LLC ("**Absolut Management**") and its affiliated debtor entities (collectively, the "**Absolut Facilities Operators**" and each an "**Absolut Facilities Operator**")[2] as debtors and debtors-in-possession (collectively, the "**Debtors**" and each a "**Debtor**") in the above-captioned jointly administered Chapter 11 cases (the "**Chapter 11 Cases**"), as plaintiffs in the above-captioned adversary proceeding (this "**Adversary Proceeding**"), hereby allege for their Complaint, upon knowledge of their own acts and upon information and belief as to all other matters, as follows:

## NATURE OF THIS ACTION

1.     This is an Adversary Proceeding brought pursuant to Rules 7001(7), 7001(9) and 7065 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and section 105 of Title 11 of the United States Code (the "**Bankruptcy Code**") seeking entry of an order: (i) declaring that defendant LaSurk ("**Defendant**" or "**LaSurk**") has violated the automatic stay

---

[2] The Absolut Facilities Operators are the following Debtors: Absolut Center for Nursing and Rehabilitation at Westfield, LLC, Absolut Center for Nursing and Rehabilitation at Allegheny, LLC, Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC, Absolut Center for Nursing and Rehabilitation at Allegheny, LLC, Absolut Center for Nursing and Rehabilitation at Gasport, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC, and Absolut at Orchard Brooke, LLC.

imposed by section 362 of the Bankruptcy Code, by continuing his active judicial proceedings against one or more of the Debtors and Debtors' members, officers and managers, all of which are based upon a Debtor's operation of a skilled nursing and assisted living facility in New York State (collectively, the "**Facilities**" and each a "**Facility**"); (ii) extending the automatic stay under section 362 of the Bankruptcy Code to the Debtors' members, officers and managers and enjoining LaSurk from the commencement or continued prosecution of his judicial proceedings and other actions alleging substantially similar facts or causes of actions against one or more of the Debtors and Debtors' members, officers and managers if not otherwise subject to the automatic stay; and/or (iii) enjoining and prohibiting LaSurk from the commencement or continued prosecution of his judicial proceedings against one or more of the Debtors and Debtors' members, officers, managers, under section 105(a) of the Bankruptcy Code until the effective date of a Chapter 11 plan (the "**Plan Effective Date**") .

2.      One or more of the Debtors and certain of Debtors' officers or managers—namely, Israel Sherman ("**Mr. Sherman**")—have been named as defendants in more than 30 actions before the trial courts of New York State (the "**Pending Actions**").  The defendant in this Adversary Proceeding is the plaintiff in *LaSurk v. Absolut Facilities Management, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, et al.*, Index No. 805925/2016; New York Supreme Court, Erie County (hereinafter the "**LaSurk Action**") and brings claims pursuant to Article 28 of New York Public Health Law seeking a monetary award for the alleged bodily injury to, or the wrongful death of a resident of one of the Debtors' Facilities before the bankruptcy petition date, September 10, 2019 (the "**Petition Date**").  LaSurk also bring claims against certain of Debtors officers and managers—namely,  Israel Sherman ("**Mr. Sherman**").

3.      The automatic stay of Bankruptcy Code section 362(a) stays the LaSurk Action as

against the Debtors and Mr. Sherman.

4.     Moreover, even if the stay does not apply to Mr. Sherman, this Court should stay or enjoin the continuation of the LaSurk Action against Mr. Sherman, pursuant to section 362(a) or section 105(a) of the Bankruptcy Code.

5.     The claims alleged in the LaSurk Action, as against Mr. Sherman, are dependent upon and inextricably intertwined with the Debtors' alleged conduct.  For example, the complaint in the LaSurk Action seeks to hold Mr. Sherman individually liable based upon his alleged status as a "controlling person" under New York Public Health Law § 2808-a.  To prove these claims against Mr. Sherman, LaSurk must first establish the underlying liability of the Debtors pursuant to a substantive section of Article 28 of the New York Public Health Law.  Without a finding of underlying liability of the Debtors, including the amount of the alleged liability, there can be no finding of liability as to Mr. Sherman.

6.     This Court should enter an order declaring that the automatic stay imposed by section 362 of the Bankruptcy Code is effective with respect to Mr. Sherman and is and has been violated by the continued prosecution of claims by LaSurk.  In the alternative, this Court should extend the automatic stay under sections 362 or 105 to stay or enjoin the continuation of the LaSurk Action against Mr. Sherman until the Plan Effective Date because allowing the LaSurk Action to proceed will eviscerate the fundamental goals of these Chapter 11 Cases and the Bankruptcy Code itself.

7.     More specifically, as long as the LaSurk Action is actively prosecuted (1) the value of the Debtors' estates will continue to erode rapidly due to the Debtors' obligation to indemnify Mr. Sherman's litigation fees and expenses, (2) the Debtors' insurance coverage, which constitutes property of the Debtors' estates will be depleted if the claims against Mr. Sherman proceed, (3)

the LaSurk Action will unnecessarily consume Mr. Sherman's time and energy when his participation is required for the Debtors to emerge successfully from Chapter 11, pursuant to this Court's forthcoming order approving a settlement agreement dated November 20, 2019 (the "**Settlement Agreement**") between the Debtors, Debtors' landlords, and Mr. Sherman and (4) the Debtors could be exposed to significant risks of collateral estoppel, *stare decisis*, and evidentiary prejudice. Without this relief, LaSurk will continue to threaten and frustrate the Debtors' on-going operations in Chapter 11 and the Debtors' pursuit of a Chapter 11 plan ("**Plan**"), including Mr. Sherman's obligations under the Settlement Agreement.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b).

9.      Venue in this district is proper under 28 U.S.C. § 1409.

10.     The statutory predicates for the relief requested herein are sections 326(a)(6)(1) and (a)(3) and 105(a) of the Bankruptcy Code and Bankruptcy Rules 7001(7), 7001(9), and 7065.

## THE PARTIES

11.     The Debtors are the plaintiffs in this Adversary Proceeding.  As of the Petition Date, Debtors – Absolut Management and the Absolut Facilities Operators – operated seven Facilities.

12.     Absolut Management is a New York limited liability company.  Absolut Management acts as the main management entity of the Debtors' business and is the manager ("**Manager**") of each of the Absolut Facilities Operators pursuant to their respective operating agreements (the "**Operating Agreements**" and each an "**Operating Agreement**"), which were each entered into prior to the Petition Date.  Mr. Sherman is the sole and managing member of Absolut Management.

13.      Each of the Absolut Facilities Operators is a New York limited liability company.

The membership of the Absolut Facilities Operators consists of Absolut Management (54%), Mr. Sherman (45%), and Samuel Sherman (1%).  Mr. Sherman is the CEO of each Absolut Facilities Operator.

14.      The Defendant in this Adversary Proceeding is the plaintiff in the LaSurk Action, who has asserted claims as the Administrator of the Estate of Rhonda LaSurk ("**Decedent**") against one or more of the Debtors and Mr. Sherman.

## BACKGROUND AND FACTS

15.      The Debtors filed their Chapter 11 Cases on September 10, 2019 (the "**Petition Date**") in this Court.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.  These Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee or examiner has been appointed in these Chapter 11 Cases.

## A.  THE DEBTORS AND THE STATUS OF THEIR CHAPTER 11 CASES

16.      The Debtors operated seven Facilities as of the Petition Date, and since that time have streamlined their business by closing the Facility at the Absolut Center for Nursing and Rehabilitation at Orchard Park (the "**Orchard Park Facility**") pursuant to an approved closure plan ("**Closure Plan**") by the New York State Department of Health and this Court.

17.      After the closure of the Orchard Park Facility, the Debtors operate six Facilities.  As of the third quarter of 2019, the Debtors employed over 1,100 full and part time staff members to deliver services and care to over 700 patients and residents at the six remaining Facilities.  Each of the Facilities is staffed 24-hours per day, seven days per week, 365-days per year.

18.      The Debtors now face multiple time-consuming, time-sensitive and complex challenges.  The Debtors intend to proceed through Chapter 11 by effecting a marketing and sale

process for the balance of their Facilities, on a consensual basis to the greatest extent possible with major stakeholders. The Debtors intend to effect these sales as part of the preparation and confirmation of a Plan. This approach to the completion of these Cases promises to maximize value of the Debtors' estate and, as a consequence, achieve the best outcome for the Debtors' legitimate creditors.

19.    The Debtors must also continue to manage and operate their business during these Chapter 11 Cases. The Debtors' day-to-day operations require attentive and continuous, hands-on management of their skilled nursing and assisted living facilities, providing service to hundreds of residents.

**The Structure of the Settlement Agreement**

20.    The Debtors have expended considerable time, effort, and resources vigorously negotiating a settlement over the last several months that would provide for a possible sale of the Debtors' operations and accounts receivables. On November 22, 2019, the Debtors filed a motion (Docket No. 268, the "**Settlement Motion**"), seeking approval of the Settlement Agreement. Pursuant to the Settlement Agreement, the Debtors agreed to an expedited and robust sale process that includes a bifurcated timeline for the sale of the Facilities separate from the sale of their accounts receivables. Therefore, contemporaneously with filing the Settlement Motion, the Debtors filed a separate motion (Docket No. 269, the "**Sale Motion**"), seeking approval of the sale processes contemplated by the Settlement Agreement.

21.    This Court held a hearing on the Settlement Motion and the Sale Motion on December 9, 2019. The Court approved the Settlement Agreement and the proposed process for the sale of the Debtors' assets.

22.    As the CEO of the Debtors, Mr. Sherman must be available throughout the sale

processes to the Debtors' investment banker and potential purchasers to respond to diligence requests and other inquiries, all while continuing to oversee the Debtors' operations and the provision of care to the residents of the Facilities. This will be no small task. As of the third quarter of 2019, the Debtors employed over 1,100 full and part time staff members to deliver services and care to over 700 patients and residents at the six remaining Facilities.

23.    In addition, as set forth in the Sale Motion, once the Debtors select a proposed purchaser or purchasers for the Facilities, the purchaser or purchasers will need to obtain regulatory and governmental approvals prior to taking over operations. To obtain such approval, it will be necessary for the Debtors' principal, Mr. Sherman, to provide substantial assistance and cooperation and to facilitate the due diligence and regulatory approval process.

24.    In particular, any proposed purchaser will require Mr. Sherman's assistance while any Change of Ownership application relating to any of the Facilities is pending with the State of New York, any Transfer of Physical Assets application is pending with HUD, and any other required New York State or federal licensure applications are pending.

25.    Pursuant to the terms of the Settlement Agreement, Mr. Sherman is required to provide this assistance and cooperation and to facilitate the transfer of operations of the Facilities.

## B. THE PENDING STATE COURT LAWSUITS

26.    To date, the Debtors and Mr. Sherman have been named in approximately 30 lawsuits, *i.e.* the Pending Actions. All of the Pending Actions were filed prior to the Petition Date and have thus been stayed as against the Debtors under section 362 of the Bankruptcy Code. Nonetheless, as one of the Pending Actions, LaSurk continues to pursue the LaSurk Action against an Absolut Facilities Operator as well as Absolut Management and Mr. Sherman.

27.    The allegations in the LaSurk Action demonstrates that Mr. Sherman's liability, if

any, is dependent upon the Debtors' liability.  Thus, proceeding against Mr. Sherman is an

immediate, *per se* violation of the automatic stay imposed by section 362(a) of the Bankruptcy

Code.

**The LaSurk Action**

28.     The LaSurk Action seeks a money judgment against Absolut Management and

Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("**Orchard Park**"), as well

as Mr. Sherman, for the purported injuries or bodily harm suffered by the Decedent, and

Decedent's alleged deprivation of rights under Public Health Law § 2803-c, when she resided at

the Orchard Park Facility from 2013 to 2015.

29.     The LaSurk Action was filed on June 3, 2016, and an amended complaint was filed

on July 20, 2017 ("**LaSurk Complaint**").  The LaSurk Complaint alleges facts against Mr.

Sherman, however; those allegations depend on the alleged conduct of the Debtors Absolut

Management and Orchard Park.  The LaSurk Complaint alleges the following, limited substantive

allegations against Mr. Sherman:

- He "was an Administrator and/or Chief Executive Officer" of the Debtors, *see* LaSurk Complaint ¶ 7;

- He "is and/or was a controlling person for [the Debtors] pursuant to New York State Public Health Law § 2808-a," *see id*, ¶ 8; and

- He "owned, operated[,] managed, directed, administered, and/or assumed responsibility" for the Debtors, *see id.*, ¶ 11.

30.     Under Public Health Law § 2808-a, a "controlling person of any residential health

care facility . . . shall be jointly and severally" liable but only "***to the same extent*** as [against a]

residential health care facility." (emphasis added).  In addition to the statute's explicit language,

case law in New York reinforces the proposition that § 2808-a does not create a separate or new

cause of action—"[i]t makes the controlling person personally liable for damages sustained by a

person asserting a claim under one of the substantive provisions of Public Health Law Article 28."

*Sunset Props. LLC v. Sunset Nursing Home*, 2005 NYLJ LEXIS 4140, *11 (N.Y. Sup. Ct., Nassau County Sept. 6, 2005).

31.     To find Mr. Sherman liable as a "controlling person," requires LaSurk to, first and foremost, establish the fact and amount of liability against the Debtors—that is, establishing the liability of Absolut Management and/or Orchard Park pursuant to § 2801-d for allegedly depriving Decedent of certain of her rights enumerated in § 2803-c.  *See* § 2801-d ("[a]ny residential health care facility that deprives any patient of said facility of any right or benefit, as hereinafter defined, shall be liable to said patient for injuries suffered as a result of said deprivation . . .").  However, determining Orchard Park's liability under the Public Health Law would violate the stay imposed by section 362(a) of the Bankruptcy Code, which has been in place since the Petition Date.  LaSurk nonetheless continues to litigate his claims against the Debtors, Absolut Management and Orchard Park, and Mr. Sherman in violation of the automatic stay.

32.     On September 11, 2019 (one day after the Petition Date), the Debtors informed LaSurk of their Chapter 11 Cases and that the stay under section 362(a) of the Bankruptcy Code prohibited further prosecution of the LaSurk Action.  In subsequent correspondences, Debtors' maintained their position concerning the stay's effect on the LaSurk Action which LaSurk did not challenge until November 2019.

33.     On November 6, 2019, LaSurk purported to advise the Debtors and Mr. Sherman of an intention to use at the December 9 trial—set prior to the Petition Date—certain business records pursuant to § 3122-a of the New York Civil Practice Law and Rules ("**CPLR**").  Section 3122-a(c) of the CPLR imposes a burden on the Debtors and Mr. Sherman to object to the use of the business records identified in the LaSurk notice within twenty days or risk losing the ability to

oppose the documents' use against them as evidence.  CPLR § 3122-a(c).

34.     Uninhibited by the clear effect of section 362(a) of the Bankruptcy Code, LaSurk's counsel communicated his intent "to move forward with the December 6 trial date as against" Mr. Sherman.

35.     LaSurk continued his prosecution of the LaSurk Action towards the December 6 trial by delivering an expert witness disclosure pursuant to CPLR § 3101(d), on November 13, 2019, which identified two proposed experts and summarized their testimony concerning the alleged deficiencies of Decedent's care and treatment at the Orchard Park Facility.  LaSurk's disclosure contained numerous allegations describing and directly implicating the Debtors and the operations and procedures at the Orchard Park Facility.

36.     Cognizant of the Chapter 11 Cases, the court presiding over the LaSurk Action adjourned the trial date from December 9, 2019 until January 30, 2020.

## C.  THE DEBTORS' OBLIGATION TO INDEMNIFY MR. SHERMAN

37.     Absolut Management, as Manager of the Absolut Facilities Operators, is a limited liability company that is managed and operated by its sole and managing member, Mr. Sherman. As the CEO of each Absolut Facilities Operator, Mr. Sherman is, and has, at all pertinent times been, an employee of each Absolut Facilities Operator.

38.     Each of the Absolut Facilities Operators has an obligation to indemnify and hold Mr. Sherman harmless "from and against all claims and demands whatsoever," subject only to the limitations of New York law.  New York's Limited Liability Company Law authorizes broad indemnification and hold-harmless provisions in favor of "any person," provided only that no such indemnification may go to a person against whom an adverse "judgment or other final adjudication" has determined that his material acts were in "bad faith" or "the result of active and

deliberate dishonesty" or if "he or she gained in fact a financial profit or other advantage to which

he or she was not legally entitled."  N.Y. L.L.C. Law § 420 (McKinney's 2019).

39.    Upon information and belief, no such judgment or other final adjudication has been

entered or made against Mr. Sherman.

40.    The operating agreement of each of the Absolut Facilities Operators contains an

indemnification provision under § 5.8 Indemnity of the Manager and Others.[3]  Under this section,

> [T]he Company [*i.e.* each Debtor] will to the maximum extent permitted . . . (a) indemnify the Manager [Absolut Management] and **hold its individual members harmless from and against any and all claims and demands whatsoever**, and (b) make advances to [Absolut Management] for all costs, attorneys' fees and expenses of litigation with respect to such indemnifying and holding [Absolut Management] harmless . . . The Company **will indemnify its employees** and other agents . . . as approved by [Absolut Management].

41.    Pursuant to § 5.8, each Absolut Facilities Operator "will indemnify" its employees.

As CEO, Mr. Sherman has rights under § 5.8 and he qualifies for this indemnification benefit.

42.    Upon information and belief, the Absolut Facilities Operators (each defined as the

"Company" under their respective operating agreements) has approved the indemnification of

employees pursuant to § 5.8.

43.    Upon information and belief, Orchard Park has approved the indemnification of its

employees, which includes Mr. Sherman.

44.    Further, each Absolut Facilities Operator must hold the "individual members" of

the Manager harmless. Since Absolut Management is the Manager of each Absolut Facilities

Operator and Mr. Sherman is Absolut Management's only member, the Absolut Facilities

Operators are each required to hold Mr. Sherman harmless "from and against any and all claims

---

[3] Each of Debtors' Operating Agreements contain substantially identical language under § 5.8 Indemnity of the Manager and Others.

and demands whatsoever."

45.    For the foregoing reasons, Mr. Sherman benefits from the indemnification obligation of all the Absolut Facilities Operators for any and all costs and fees that he may incur in his defense of the Pending Actions, including the LaSurk Action, as well as for any liability that may be determined against him.

## D. THE DEBTORS' INSURANCE POLICY

46.    The Debtors and Mr. Sherman are named co-insureds under certain "claims made and reported" insurance policies which were put in place before the Petition Date.  Claims reported between July 9, 2015 and July 8, 2016 are specifically covered by the Aging Services Claims Made policy dated August 11, 2015 (with all schedules and endorsements, "**15/16 Policy**" or the "**Policy**"), issued by JLT Reinsurance Brokers Ltd. for Underwriters at Lloyd's, London (the "**Insurer**").

47.    The LaSurk Action which was originally filed on June 3, 2016 is covered by the 15/16 Policy.

48.    The "Insureds" under the Policy includes each of Absolut Management, the Absolut Facilities Operators and any "members," "managers" and "Executive Officers" of Absolut, such as Mr. Sherman.

49.    The Policy provides coverage, including professional and general liability, for the "Insureds."  The coverage also extends to losses and compels the Insurer to defend any covered claim.  The locations of the events giving rise to covered claims include the Facilities.

50.    The 15/16 Policy provides an overall aggregate limit of $10,000,000, with other, lower aggregate limits for specific claim types.  For example, the aggregate limit for professional or general liability claims is $3,000,000.  Further, the Policy imposes a limit on coverage for each

claim or occurrence of $1,000,000.  The Policy also imposes a self-insured retention ("**SIR**") on the Insureds for professional or general liability claims of $250,000 per claim, with additional aggregate limits on the SIR under each Policy.

51.      The 15/16 Policy, the proceeds of the Policy, and any rights incident to the Policy are property of the Debtors' estates, as defined under section 541 of the Bankruptcy Code.

**Claims Paid for Mr. Sherman's Liability Would Reduce Debtors' Available Insurance**

52.      As Insureds, the Debtors timely reported all Pending Actions including the LaSurk Action to the Insurer as "Claims" for potential liability of the named defendants, including one or more of the Debtors and Mr. Sherman.  The Debtors submit that the LaSurk Action qualifies as "Claims" under the Policy and the Insurers have engaged defense counsel pursuant to the defense obligations under the Policy.

53.      Under the Policy, any coverage extended and Claim paid for, or to, any Insured reduces the amount of coverage available to the other Insureds under each Policy's aggregate limits.  Accordingly, were Mr. Sherman to recover and receive a loss payment against a Claim under the Policy, the overall aggregate coverage limit, the "per claim" aggregate limit, and the per category aggregate limit would be reduced dollar-for-dollar under the same Policy for the other Insureds.  In other words, any recovery by Mr. Sherman to compensate a loss on any covered claim would either reduce or extinguish the coverage available for the Debtors, both on that claim and under one or more of the other aggregate limits of the 15/16 Policy.

54.      Under the 15/16 Policy, the insured "Loss" includes "Claims Costs" which covers the costs and expenses of "investigation, adjustment, defense and settlement of any covered Claim."  "Claims Costs are part of and *not* in addition to" the Policy's aggregate and per-claim limits on coverage.  Accordingly, the "payment of Claims Costs . . . will reduce and may exhaust

the Limit of Liability."

55.     All Insureds covered by the 15/16 Policy "share the Limit of Liability."  Therefore, any additional Insureds seeking coverage for a Claim under the Policy cannot increase the amount of coverage available.  Any additional Insureds seeking coverage for a "Related Claim"—which means Claims for "any actual or alleged act, error or omission . . . by an Insured in rendering or failing to render" its services or bodily injury arising from the "same or related facts, circumstances, situations, transactions, or events . . ." under the Policy cannot increase the amount of coverage available either.

56.     Under these terms, if the Insurer expends money fulfilling its obligations to defend Mr. Sherman in the LaSurk Action (which is covered by the 15/16 Policy), the defense costs and fees resulting from separate prosecutions or trials will reduce, and potentially exhaust, the amount of coverage available to the Debtors—***both*** for Debtors' defense costs and expenses ***and*** their potential liability in certain of the Pending Actions.

57.     For example, the damages sought by the LaSurk Action (which is covered by the 15/16 Policy) arise from the same event or occurrence of Decedent's alleged bodily harm or wrongful death at the Orchard Park Facility.  If Mr. Sherman is required to defend himself in the LaSurk Action, his defense costs will more than likely drain the $1,000,0000 per-claim limit under the Policy to the detriment of the Debtors, who may later be required to defend themselves against LaSurk's identical or similar claims.

58.     If Mr. Sherman were required to defend himself in the LaSurk Action at this time, the Debtors will be forced to either (i) participate in the LaSurk Action as if there were no automatic stay in place, requiring even greater intervention and use of this Court's resources or (ii) continue enjoying the protection of the stay while Mr. Sherman's lone defense consumes limited

insurance funds available to the Debtors under the 15/16 Policy and depletes the Debtors' estate assets.  In either scenario, the Debtors would likely be constrained to suffer a loss of available coverage as the Insurer defends Mr. Sherman.

59.     Should the Court not stay or enjoin the LaSurk Action, any resulting liability of Mr. Sherman would reduce the benefit available to the Debtors to address their potential liability on a Related Claim or other Claims, while simultaneously compromising the Debtors' property interest in their coverage under the 15/16 Policy.

**Forcing Mr. Sherman to Pay the SIR Creates a Claim Against the Debtors' Estate**

60.     In light of the $250,000 per-claim SIR, and the Insurers' apparent position that they will not fund "below" this amount despite the pending Chapter 11 Cases, Mr. Sherman would likely need to pay for his legal defense, should the Pending Actions proceed against him.  This result would be detrimental to the Debtors.  As Mr. Sherman paid for his legal defense, he would simply incur ever-increasing indemnification claims against the Debtors.

61.     In short, forcing Mr. Sherman to pay out-of-pocket for his legal defense in any Pending Action, including the LaSurk Action, would lead to the Debtors' incurrence of liability to Mr. Sherman as his indemnitor.  Indeed, to Absolut's additional determent, the incurrence of this liability would be out of the Debtors' control and detrimental to the overall estates.

**E.  EFFECT OF THE PENDING ACTIONS ON THE DEBTORS' ESTATE**

62.     Regardless of the merits of their claims, permitting LaSurk to pursue the LaSurk Action will only result in inefficient litigation that would deplete estate assets, misdirect management attention, severely harm the Debtors' on-going business operations and jeopardize the Debtors' ability to confirm a Plan.

63.     This Court should enter an order declaring the LaSurk Action against Mr. Sherman

is an immediate, *per se* violations of the automatic stay imposed by section 362(a) of the Bankruptcy Code.  In the alternative, this Court should extend the automatic stay under sections 362(a) or 105 to stay or enjoin the continuation of the LaSurk Action against Mr. Sherman for the following reasons.

**The Continuation of the Pending Actions Against Mr. Sherman Would Immediately and Adversely Affect the Debtors' Estates**

64.     *First*, the Debtors will face significant indemnification claims if the Pending Actions proceed against Mr. Sherman.  The Absolut Facilities Operators are obligated to indemnify Mr. Sherman for all costs, attorneys' fees, and expenses of litigation.  Each Absolut Facilities Operator must also hold Mr. Sherman harmless from and against any and all claims and demands whatsoever.  These indemnification obligations will have substantial and adverse economic consequences on the Debtors' estates.

65.     *Second*, if the LaSurk Action against Mr. Sherman proceeds, his lone defense costs and fees will reduce, and potentially drain, the ***entirety*** of insurance coverage available to the Debtors for their subsequent defense costs and expenses, and their potential liability in the LaSurk Action and even certain of the Pending Actions, because all the named Insureds under the 15/16 Policy (which include the Debtors and Mr. Sherman) share the limit of liability.  Since the 15/16 Policy, its proceeds, and any rights under the Policy are property of the Debtors' estates, any reduction of insurance coverage by Mr. Sherman would effectively result in depletion of the Debtors' estates.

66.     *Third*, beyond the economic and property damage to the Debtors if the Pending Actions continue against Mr. Sherman, active litigations and an impending trial —particularly in the LaSurk Action—will so distract Mr. Sherman's required time, efforts, and attention as to undermine the Debtors' management of their on-going day-to-day business operations and ability

to effectuate the Settlement Agreement approved by this Court.  That Settlement Agreement, however, is expressly contingent upon Mr. Sherman's substantial assistance to ensure a smooth transition to new owners, which is additionally required by N.Y. Pub. Health Law § 2801-a and any other pending approvals required by the HUD, the State of New York, and federal law.  If Mr. Sherman's cooperation and efforts are diverted to defending any Pending Actions, he may default on his obligations under the Settlement Agreement, which also may cause the Debtors to default on their obligations under the Settlement Agreement, derailing the Debtors' efforts to sell certain of their assets and preventing the Debtors from successfully emerging from their Chapter 11 Cases.

67.    *Finally*, the Debtors would otherwise be exposed to a significant risk of collateral estoppel, *stare decisis*, and evidentiary prejudice if the LaSurk Action against Mr. Sherman continues.  The alleged conduct of Absolut Management and the Absolut Facilities Operators is the foundation for LaSurk's claims and allegations against Mr. Sherman.  Any judicial decision in the LaSurk Action  – whether on the merits or even on procedural issues – on these claims against Mr. Sherman would inevitably be sought to be used against the Debtors in subsequent litigations.

68.    In a similar vein, if the LaSurk Action is not suspended, the Debtors would be compelled to defend against liability in the LaSurk Action or subject themselves to the liability determination resulting from a finding against them as the named defendants in the LaSurk Action.  Such a result is precisely the problem that the automatic stay under section 362(a) of the Bankruptcy Code is designed to guard against.

## NATURE OF REQUESTED RELIEF

69.    The Debtors seek a declaratory judgment declaring the LaSurk Action violates the stay of section 362(a) of the Bankruptcy Code, or extending the automatic stay of sections 362(a) to stay the continued prosecution of the LaSurk Action or, enjoining the continued prosecution of

the LaSurk Action pursuant to section 105 of the Bankruptcy Code during the pendency of the

Chapter 11 Cases.

## FIRST CLAIM FOR RELIEF
### (Section 362 Declaratory Judgment)

70.     The Debtors repeat and reallege the allegations Complaint set forth above as if fully

set forth herein.

71.     The Debtors seek an order declaring the continued prosecution of the LaSurk

Action against Mr. Sherman is an immediate *per se* violation of the automatic stay imposed by

section 362(a) of the Bankruptcy Code.

72.     The LaSurk Action which asserts claims against Mr. Sherman are not based on any

actions or omissions he personally took but rather allege that he is jointly liable to the "same

extent" of the Debtors' alleged acts or omissions because he is the Debtors' "controlling person"

as defined in section 2808-a of the Public Health Law.  LaSurk is bound by his allegation that Mr.

Sherman is the Debtors' controlling person under Public Health Law section 2808-a.

73.     Public Health Law section 2808-a(1) regulates the liability of "a controlling person

of any residential health care facility."  N.Y. Pub. Health Law § 2808-a(1).  Under that section, if

the residential health care facility is liable for any form of damages under Article 28 of the Public

Health Law, the controlling person "shall also be liable, jointly and severally, with and ***to the same***

***extent as such residential health care facility***."  *Id.* (emphasis added).

74.     This statute thus requires LaSurk to establish the fact and amount of liability against

the Debtors before – or simultaneously with – determining any liability of Mr. Sherman.  It is

therefore impossible to fix liability against Mr. Sherman under Public Health Law section 2808-a

without also fixing liability against the Debtors themselves.

75.     The determination of liability against the Debtors, however, would violate the stay

imposed by section 362(a)(6) of the Bankruptcy Code  which expressly stays "any act to . . . assess . . . a claim against the [Absolut Debtors] that arose before the [Commencement Date]."

76.     Section 362(a) of the Bankruptcy Code immediately enjoins state court actions, like the LaSurk Action, which violate the Bankruptcy Stay.

77.     This Court should therefore issue an order enforcing the stay and declaring that any prosecution of the LaSurk Action against Mr. Sherman is an immediate, *per se* violation of the automatic stay imposed by section 362(a) of the Bankruptcy Code.

### SECOND CLAIM FOR RELIEF
**(Section 362 Injunctive Relief)**

78.     The Debtors repeat and reallege the allegations set forth above as if fully set forth herein.

79.     If this Court does not determine that prosecution of the LaSurk against Mr. Sherman is an immediate *per se* violation of the stay under section 362(a) of the Bankruptcy Code, the Court should issue Debtors an order staying or enjoining the continuation of the Pending Actions as against Mr. Sherman until the Plan Effective Date, pursuant to section 362(a) of the Bankruptcy Code.

80.     Extension of the automatic stay is warranted because allowing judicial proceedings to continue against Mr. Sherman will expose the Debtors to significant indemnification claims resulting in significant and adverse economic consequences to the Debtors' estates.

81.     Extension of the automatic stay is additionally warranted because allowing LaSurk to continue prosecuting the LaSurk Action against Mr. Sherman will deplete or entirely exhaust the Debtors shared insurance coverage under the 15/16 Policy for the costs and expenses of defending the LaSurk Action and for the liability of that may result in the LaSurk Action.  The Policy is an asset of the Debtors' estates.

82.     Extension of the automatic stay is further warranted because allowing LaSurk to continue prosecuting the LaSurk Action against Mr. Sherman will divert his required time, attention, and efforts, undermine the Debtors' on-going business operations, and derail the Debtors' ability to effect the Settlement Agreement, which is expressly reliant upon Mr. Sherman's extensive cooperation.

83.     Extension of the automatic stay is further warranted because allowing LaSurk to continue prosecuting the LaSurk Action against Mr. Sherman will expose the Debtors to a significant risk of collateral estoppel, *stare decisis*, and evidentiary prejudice.

84.     Absent an extension of the automatic stay under section 362(a) of the Bankruptcy Code, the prosecution of the LaSurk Action will thwart the Debtors' prospects for confirming a Plan.

85.     For the foregoing reasons, the Debtors seek a judgment and order extending the stay to Mr. Sherman under section 362(a) of the Bankruptcy Code.

### THIRD CLAIM FOR RELIEF
**(Section 105 Injunctive Relief)**

86.     The Debtors repeat and reallege the allegations set forth above as if fully set forth herein.

87.     The Debtors seek an order and judgment enjoining the continued prosecution of the LaSurk Action against Mr. Sherman under section 105(a) of the Bankruptcy Code until the Plan Effective Date or further order of this Court.

88.     Section 105(a) permits this Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), this Court has the jurisdiction and authority to enjoin the LaSurk Action because it will have a direct and substantial, adverse impact on the Debtors' estate. The LaSurk Action is

based on conduct substantially identical to, and inextricably intertwined with, that alleged to have been engaged in by the Debtors and could give rise to potential future indemnification claims against the Debtors or otherwise diminish shared insurance coverage.

89.     As explained above, a successful Chapter 11 case is likely given the approved Settlement Agreement.  A stay of the LaSurk Action is essential to this success, as there would be no settlement without Mr. Sherman's continued time, efforts, and attention, required to operate the Debtors' day-to-day business and which are essential to the successful transition and sale of certain assets of the Debtors to new owners.  This Court should not allow the Debtors' likely Chapter 11 success to be undermined by LaSurk's claims that deplete estate assets and threaten the approved settlement structure.

90.     In the absence of a stay of the LaSurk Action against Mr. Sherman, the Debtors will suffer irreparable harm to the Debtors' contemplated sale of certain assets and their on-going day-to-day operations.  LaSurk alleges claims that are substantially identical to, and inextricably linked to, the Debtors' alleged conduct.  LaSurk's claims do not distinguish between the actions of the Debtors or Mr. Sherman—rather, he asserts that the Debtors and Mr. Sherman are liable for the same alleged acts or omissions, under the same theories.  Because the claims alleged in the LaSurk Action are inextricably intertwined with the very same claims made against the Debtors, absent a stay under section 105(a) of the Bankruptcy Code, the Debtors are likely to suffer irreparable harm which far outweighs any harm to LaSurk including:

(a)     The risk that a finding of liability as against Mr. Sherman would harm the Debtors' estates because of the Debtors Absolut Facilities Operators' obligation to indemnify Mr. Sherman;

(b)    The depletion of insurance coverage of the Debtors—property of the Debtors' estates— based on any coverage afforded to Mr. Sherman both for his litigation costs and fees and substantive liability thus resulting in depletion of the Debtors estates;

(c)    The burdensome costs and distraction of outside litigations that would undermine Mr. Sherman's participation to transition successfully the Debtors' business to new owners and frustrate the Debtors' efforts toward a Plan; and

(d)    The risk  of collateral estoppel, *stare decisis* or adverse evidentiary findings that will impair the Debtors' ability to defend themselves in subsequent litigation.

91.    The injunctive relief sought by the Debtors is necessary and proper to continue operating the Facilities in Chapter 11, effectuate the settlement, move forward with the sale and marketing process, effectuate a sale and transfer of ownership and allow for an unobstructed opportunity to confirm a Plan.

92.    If the LaSurk Action against Mr. Sherman is enjoined, there is a substantial likelihood that the Debtors will achieve a sale or sales of assets and confirm a Plan.

93.    The requested injunctive relief will serve the public interest by promoting compliance with the legislative purpose of the automatic stay under section 362(a) of the Bankruptcy Code and facilitate the Debtors' success in Chapter 11.  The public interest will also be served in light of the crucial role that Mr. Sherman plays with respect to the employees who must continue to provide high quality care to the hundreds of residents remaining at the Debtors' Facilities.  The requested injunctive relief is therefore critical to ensuring the safety, protection, and medical care of the residents.

94.    For the foregoing reasons, this Court should exercise its equitable powers pursuant to section 105(a) of the Bankruptcy Code and enjoin LaSurk from prosecuting the LaSurk Action

against Mr. Sherman.  Allowing the LaSurk Action to proceed will threaten and frustrate both the Debtors' on-going operations in Chapter 11 and the Debtors' pursuit of a confirmable Plan and Settlement Agreement.

## PRAYER FOR RELIEF

**WHEREFORE**, the Debtors respectfully request that this Court enter judgment in their favor and request relief as follows:

(i)     entry of an Order declaring that the continued prosecution of the LaSurk Action against Mr. Sherman violates the stay currently in place under section 362(a) of the Bankruptcy Code; or

(ii)    in the alternative, entry of an Order declaring the stay under section 362(a) of the Bankruptcy Code extends to Mr. Sherman until the Plan Effective Date; and/or

(iii)   entry of an Order granting an injunction pursuant to section 105(a) of the Bankruptcy Code, enjoining and prohibiting the continued prosecution of the LaSurk Action against Mr. Sherman until the Plan Effective Date; and

(iv)    entry of an Order directing counsel for LaSurk to cooperate with the Debtors for the purpose of causing the state court to adjourn or stay the LaSurk Action; and

(v)     an award granting Mr. Sherman's actual damages, including costs and attorneys' fees resulting from Defendant LaSurk's willful violation of the stay under section 362(k) of the Bankruptcy Code; together with

(iii)   such other and further relief as this Court deems just and proper.

Dated:   December 17, 2019
      New York, New York

                            LOEB & LOEB LLP

                            */s/* Schuyler G. Carroll
                            Schuyler G. Carroll
                            William M. Hawkins
                            Evan K. Farber
                            Mary Jean Kim
                            345 Park Avenue
                            New York, NY 10154
                            Tel: (212) 407-4000
                            Fax: (212) 407-4990
                            scarroll@loeb.com
                            whawkins@loeb.com
                            efarber@loeb.com
                            mjkim@loeb.com

                            *Counsel for the Debtors*