**LOEB & LOEB LLP**
Schuyler G. Carroll
William M. Hawkins
Evan K. Farber
Mary Jean Kim
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 407-4990
Email: scarroll@loeb.com
whawkins@loeb.com
ekfarber@loeb.com
mjkim@loeb.com

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | ) Chapter 11 |
| | ) |
| | ) Case No. 19-76260 (AST) |
| | ) Case No. 19-76263 (AST) |
| In re: | ) Case No. 19-76267 (AST) |
| | ) Case No. 19-76268 (AST) |
| Absolut Facilities Management, LLC, *et al*. | ) Case No. 19-76269 (AST) |
| | ) Case No. 19-76270 (AST) |
| Debtors.[1] | ) Case No. 19-76271 (AST) |
| | ) Case No. 19-76272 (AST) |
| | ) |
| | ) (Jointly Administered) |
| | ) |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

|  |  |
|---|---|
| Absolut Facilities Management, LLC, et al., | ) ) ) |
|  | ) Chapter 11 |
| Plaintiffs, | ) |
| v. | ) Case No. 19-76260-ast |
|  | ) Case No. 19-76263-ast |
| Mark LaSurk, as Administrator of the Estate of Rhonda LaSurk, | ) ) Adv. Pro. No. 8:19-AP-08155 |
|  | ) |
| Defendant. | ) ) ) |

### DECLARATION OF MICHAEL WYSE IN SUPPORT OF DEBTORS' MOTION TO ENFORCE THE AUTOMATIC STAY AND FOR A PRELIMINARY INJUNCTION

I, Michael Wyse make this declaration under 28 U.S.C. § 1746 (the "**Declaration**"):

1.     I am over the age of 18.  I make this Declaration in support of the Motion for a Preliminary Injunction submitted by Absolut Facilities Management, LLC ("**Absolut Management**") and its affiliated debtor entities (collectively, the "**Absolut Facilities Operators**" and each an "**Absolut Facilities Operator**"),[2] as debtors and debtors-in-possession (collectively, the "**Debtors**" and each a "**Debtor**") in the above-captioned jointly administered Chapter 11 cases (the "**Chapter 11 Cases**") for a preliminary injunction barring prosecution of the state court action entitled *LaSurk v. Absolut Facilities Management, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC*, *et al.*, Index No. 805925/2016; New York Supreme Court, Erie Cty. (hereinafter the "**LaSurk Action**") by plaintiff therein ("**Plaintiff**") as against defendant

---

[2] The Absolut Facilities Operators are the following Debtors: Absolut Center for Nursing and Rehabilitation at Westfield, LLC, Absolut Center for Nursing and Rehabilitation at Allegheny, LLC, Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC, Absolut Center for Nursing and Rehabilitation at Gasport, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC, and Absolut at Orchard Brooke, LLC

Israel Sherman ("**Mr. Sherman**"), pending a determination of the relief requested herein, which relief includes: (1) an order enforcing the automatic stay of Bankruptcy Code § 362 and declaring that prosecution of the LaSurk Action by Plaintiff as against Mr. Sherman violates the automatic stay that is currently in place in these Chapter 11 Cases; (2) an order extending the automatic stay to encompass and enjoin the prosecution of the LaSurk Action as against Mr. Sherman pursuant to Bankruptcy Code § 362; or (3) an order enjoining the prosecution of the LaSurk Action as against Mr. Sherman pursuant to Bankruptcy Code § 105.

2.      I am the Chief Restructuring Officer of the Debtors.  I was the declarant in support of the Debtors' Chapter 11 petitions and incorporate by reference the facts set forth in my previously submitted declarations (submitted at Dkt. Nos. 15, 20, 57, 68, and 97) as if fully set forth herein.  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases.

3.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors, or my opinion, which itself would be based on my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## THE DEBTORS AND THE STATUS OF THEIR CHAPTER 11 CASES

4.      As of the petition date, September 10, 2019 (the "**Petition Date**"), the Debtors – Absolut Management and the Absolut Facilities Operators – operated six skilled nursing and assisted living facilities in New York State (collectively, the "**Facilities**" and each a "**Facility**").

5.      Absolut Management is a New York limited liability company which acts as the

main managing entity of the Debtors' business.    Absolut Management is the manager ("**Manager**") of each of the Absolut Facilities Operators pursuant to their respective operating agreements, which were each entered into prior to the Petition Date.    Mr. Sherman is the sole managing member of Absolut Management.    Attached hereto as **Exhibit A** is a true and correct copy of Absolut Management's Operating Agreement, dated February 2, 2006.

6.        Attached hereto as **Exhibit B** is a true and correct copy of the Operating Agreement of the Absolut Facilities Operator, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, dated February 16, 2006 ("**Orchard Park**"), as an exemplar of each of the Operating Agreements.    Each of the other Operating Agreements is nearly identical.    Each of the Absolut Facilities Operators is a New York limited liability company consisting of the following members and membership interests: Absolut Management (54%), Mr. Sherman (45%), and Samuel Sherman (1%).    Mr. Sherman is the CEO of each Absolut Facilities Operator.    As the CEO, Mr. Sherman is, and has at all pertinent times been, an employee of each of the Absolut Facilities Operators. *See* Orchard Park Operating Agreement § 5.4 and Schedule A.

7.        Since the Petition Date, the Debtors have streamlined their business operations by closing the Facility at Orchard Park (the "**Orchard Park Facility**") pursuant to a closure plan approved by the New York State Department of Health and this Court.    Even after the closure, the Debtors must continue to manage and operate their business during their Chapter 11 Cases.    To permit continued business operations, the Debtors now endeavor to achieve a final order for debtor-in-possession financing and use of cash collateral.

8.        In addition, the Debtors' day-to-day operations require attentive and continuous, hands-on management of their skilled nursing and assisted living facilities.    As of the third quarter of 2019, the Debtors employed over 1,100 full and part time staff members to deliver services and

care to over 700 patients and residents at the six remaining Facilities.  Each of the Facilities is staffed 24-hours per day, seven days per week, 365-days per year.

9.      Over the last several months, the Debtors have expended considerable time, effort, and resources vigorously negotiating a settlement that would provide for a possible sale of the Debtors' operations and accounts receivables.  On November 22, 2019, the Debtors filed a motion (Docket No. 268, the "**Settlement Motion**"), seeking approval of a November 20, 2019 Settlement Agreement among the Debtors, Debtors' landlords, and Mr. Sherman (the "**Settlement Agreement**").  Pursuant to the Settlement Agreement, the Debtors agreed to an expedited and robust sale process that includes a bifurcated timeline for the sale of the Facilities separate from the sale of their accounts receivables.  Therefore, contemporaneously with filing the Settlement Motion, the Debtors filed a separate motion (Docket No. 269, the "**Sale Motion**"), seeking approval of the sale processes contemplated by the Settlement Agreement.

10.      The Court held a hearing on the Settlement Motion and the Sale Motion on December 9, 2019, at which the Court approved the Settlement Agreement and the proposed process for the sale of the Debtors' assets.  Attached hereto as **<u>Exhibit C</u>** is the Settlement Agreement.

### MR. SHERMAN'S UNIQUE AND INDISPENSABLE ROLE

11.      As the CEO of the Debtors, Mr. Sherman's continued cooperation is critical to the Settlement Agreement.  First, Mr. Sherman must be available throughout the sale processes to respond to the Debtors' investment banker and potential purchasers concerning diligence requests and other inquiries, all while continuing to oversee the Debtors' operations and the provision of care to the residents of the Facilities.  *See* Exhibit C at ¶ 18.

12.      Although the Debtors recently added certain personnel, such as Phillip Hoffman, William K. Lenhart, and myself, Mr. Sherman is truly the key to the Debtors' operations and to

the employees.  As is typical in any company struggling through distressed times, particularly one that has filed bankruptcy and is in the midst of an expedited sale process, the Debtors have been challenged to avoid problems with employee morale.  This is particularly concerning because each and every employee's work is vital to providing the residents the high quality experience they expect – not to mention to ensuring their safety, protection and medical care.  If just one employee fails to execute his or her duties timely and properly, it could mean life or death for a resident.  Despite these challenges, as recognized by the Patient Care Ombudsman and the DOH, the Debtors have continued to provide high quality care to the residents.

13.    This high quality of care is thanks to Mr. Sherman's efforts, and his oversight is critical to ensuring that that continues.  Mr. Sherman's hands-on approach and wealth of experience in health care administration allows him to create an excellent working environment.[3] He has a long history with the Debtors and working with the employees.  None of the new individuals have any prior relationships with the business or the employees.  So, uniquely, Mr. Sherman's relationships allow him to ensure the cooperation of employees and continued quality care.

14.    In addition, as set forth in the Sale Motion, once the Debtors select a proposed purchaser or purchasers for the Facilities, the purchaser or purchasers will need to obtain regulatory and governmental approvals prior to taking over operations of the Facilities.  To obtain such approval, it will be necessary for Mr. Sherman to provide reasonable assistance and cooperation and to facilitate the due diligence and regulatory approval process.  In particular, any proposed

---

[3] Mr. Sherman received an MBA in Health Care Administration from Baruch College/Mt. Sinai School of Medicine in 1979.  Since then, he has worked almost exclusively in the area of senior health care administration.  Mr. Sherman has been licensed by the New York State Department of Health as an owner and operator since 2006.  His extensive experience includes work in senior level administration roles at more than 20 senior care facilities.

purchaser will require Mr. Sherman's assistance while any Change of Ownership application relating to any of the Facilities is pending with the State of New York, any Transfer of Physical Assets application is pending with HUD, and any other required New York State or federal licensure applications are pending. Pursuant to the terms of the Settlement Agreement, Mr. Sherman has committed to providing this assistance and cooperation and to facilitate the transfer of operations of the Facilities. Ultimately, upon the closing of any such transactions, Mr. Sherman must provide releases. *See* Exhibit C at ¶¶ 18-21.

15.    Thus, requiring Mr. Sherman to defend against the LaSurk Action will further deplete the Debtors' estates and compromise the Debtors' chances for a successful and confirmable Plan by improperly diverting his attention away from his duties under the Settlement Agreement and from maintaining the Debtors' operations, supporting marketing efforts, and ensuring a smooth transition to new owners.

16.    The Debtors now face multiple time-consuming, time-sensitive and complex challenges. The Debtors intend to proceed through Chapter 11 by developing a marketing and sale process for the balance of their Facilities, on a consensual basis to the greatest extent possible with major stakeholders. The Debtors intend to effect these sales as part of the preparation and confirmation of a plan for Chapter 11 liquidation (a "**Plan**"). This approach to the completion of these Chapter 11 Cases promises to maximize value of the Debtors' estates and, as a consequence, achieve the best outcome for the Debtors' legitimate creditors. In fact, the Settlement Agreement is imperative to the success of a confirmable Plan.

## THE LASURK ACTION

17.    A further challenge – the LaSurk Action – now threatens to derail the Debtors approved Settlement Agreement which will allow the Debtors to effectuate the sale of their assets and prepare and confirm a Plan.

18.     Prior to the Petition Date, numerous state court civil proceedings were filed by individuals or the executors of their estates against one or more of the Debtors, arising from events alleged to have occurred at the Facilities.  The plaintiffs in these actions generally assert claims of personal injury, wrongful death, and/or the deprivation of certain enumerated rights of residents as set forth in New York Public Health Law § 2803-c against one or more of the Debtors.  In approximately 30 of these cases (the "**Pending Actions**"), the plaintiffs also assert claims against Mr. Sherman, but generally not based on any actions or omissions he personally took; instead, these plaintiffs allege that Mr. Sherman is liable for the Debtors' alleged acts or omissions because he is the Debtors' "controlling person" as defined in Public Health Law § 2808-a.  Attached hereto as **Exhibit D** is Plaintiff's summons and complaint which were filed on June 3, 2016.  Attached hereto as **Exhibit E** is Plaintiff's amended complaint which was filed on July 10, 2017.

19.     Upon the filing of the petition and the imposition of the automatic stay, the plaintiffs in most of the Pending Actions have not attempted to move their cases to trial, and thus appear through their actions to have tacitly acknowledged that the Pending Actions are automatically stayed in their entirety.   However, recently, the Plaintiff in the LaSurk Action has sent correspondence taking the position that the LaSurk Action can move forward to trial – which is currently scheduled for the end of January 2020[4] – as against Mr. Sherman, even as the remainder of the case is stayed as against the Debtors themselves.

20.     After being notified on September 11, 2019 that the automatic stay under section 362(a) of the Bankruptcy Code prohibited further prosecution of the LaSurk Action – one day after the Petition Date – the Plaintiff raised no objections or challenges until November 2019.

---

[4] Cognizant of the Debtors' Chapter 11 Cases, the state court presiding over the LaSurk Action adjourned the trial date from December 9, 2019 until January 30, 2020.

Specifically, on November 6, 2019, LaSurk purported to advise the Debtors and Mr. Sherman of an intention to use at the December 9 trial – set prior to the Petition Date – certain business records pursuant to § 3122-a of the New York Civil Practice Law and Rules.   Attached as **Exhibit F** is a true copy of a letter dated November 6, 2019 from Plaintiff's counsel, purporting to provide Plaintiff's Section 3122-a(c) notice.   Section 3122-a(c) imposes a burden on the defendants to object to the use of the business records identified in the LaSurk notice within twenty days or risk losing the ability to oppose the documents' use against them as evidence.  CPLR § 3122-a(c).

21.    Attached as **Exhibit G** is a true copy of a letter dated November 11, 2019 from Plaintiff's counsel, asserting that Mr. Sherman "is individually responsible for the subject claims pursuant to New York Public Health Law § 2808-a" and that it was Plaintiff's "intention to move forward with the December 6th trial date as against him."

22.    Thereafter, on November 13, 2019, Plaintiff delivered an expert witness disclosure pursuant to an expert witness disclosure pursuant to CPLR § 3101(d), identifying two proposed experts and summarizing their testimony concerning the alleged deficiencies of Decedent's care and treatment at the Orchard Park Facility.  Attached as **Exhibit H** is a true copy of Plaintiff's Expert Disclosure.  As shown by Plaintiff's Expert Disclosure, numerous allegations describe and directly implicate the Debtors and the operations and procedures at the Orchard Park Facility in violation of the automatic stay under Section 362(a) of the Bankruptcy Code.

23.    Moreover, just last week, the Plaintiff filed an order to show cause in the state court seeking to sever the LaSurk Action as against Mr. Sherman for the purpose of commencing trial against him alone.  Attached as **Exhibit I** is a true copy of Plaintiff's order to show cause dated December 12, 2019.

**ANY JUDGMENT AGAINST MR. SHERMAN WILL HAVE AN
"IMMEDIATE ADVERSE ECONOMIC CONSEQUENCE" ON THE DEBTORS**

    A.    **Debtors' Operating Agreements Require Them to Indemnify Mr. Sherman**

24.    Requiring Mr. Sherman to defend against the LaSurk Action will deplete the Debtors' estates due to the Absolut Facilities Operators' obligation to indemnify and hold Mr. Sherman harmless "from and against all claims and demands whatsoever," subject only to the limitations of New York law.  *See* Exhibit B at § 5.8.  All other Operating Agreements contain substantially identical provisions.

25.    Section 5.8 requires indemnification of Mr. Sherman in two ways.  First, each Absolut Facility Operator must hold the "individual members" of the Manager harmless.  Because the "Manager" is Absolut Management and Mr. Sherman is its only member, the Absolut Facilities Operators are required to hold Mr. Sherman harmless "from and against any and all claims and demands whatsoever." *Id.*  Second, each Absolut Facility Operator "will indemnify" its employees under its Operating Agreement.  As CEO, Mr. Sherman is an employee of each Absolut Facility Operator and thus qualifies for indemnification in this way too.

    B.    **Mr. Sherman Is a Co-Insured Under Debtors' Relevant Insurance Policy**

26.    Allowing the LaSurk Action to proceed uninhibited by any stay or injunction will reduce the Debtors' insurance coverage – an estate asset – and thus deplete the Debtors' estates because Mr. Sherman is a co-insured under the Debtors' relevant "claims made and reported" insurance policies which have been in effect since before the Petition Date.  Any payment in defending or covering Mr. Sherman would reduce in equal measure the coverage available for the Debtors, both on that claim and under one or more of the other aggregate limits for each of the insurance policies.

27.    As is relevant to the LaSurk Action, the Debtors are insured by the Aging Services

Claims Made Policy dated August 11, 2015, issued by JLT Reinsurance Brokers Ltd. for Underwriters at Lloyd's, London (with all schedules and endorsements, the "**Policy**"). A true copy of the Policy is attached hereto as **Exhibit J**. With regard to claims made during other time periods, which include claims in some of the other Pending Actions, the Debtors are insured by other "claims made and reported" policies which are similar in most respects, though not identical, to the Policy at issue here.

## THE DEBTORS WILL SUFFER IRREPARABLE HARM ABSENT A STAY OR INJUNCTION

28.     In the absence of a stay of the LaSurk Action against Mr. Sherman, the Debtors will suffer irreparable harm to the contemplated sale of certain assets and their on-going day-to-day operations. As indicated above, the Plaintiff allege claims that are substantially identical to, and inextricably linked to the Debtors' alleged conduct. Plaintiff's causes of action also do not distinguish between the actions of the Debtors or Mr. Sherman – rather, they assert that Debtors and Mr. Sherman are jointly and severally liable for the same alleged acts or omissions, under the same theories. Because the claims alleged in the Pending Actions are inextricably intertwined with the very same claims made against the Debtors, absent a stay, the Debtors are likely to suffer irreparable harm which far outweighs any harm to the Plaintiff including:

(a)     The risk that a finding of liability as against Mr. Sherman will harm the Debtors' estate because of Debtors the Absolut Facilities Operators obligation to indemnify Mr. Sherman's litigation fees and expenses;

(b)     The depletion of insurance coverage of the Debtors – property of the Debtors' estates – based on any coverage afforded to Mr. Sherman thus resulting in depletion of the Debtors estates;

(c)    The burdensome costs and distraction of outside litigations that would undermine Mr. Sherman's participation to transition successfully the Debtors' business to new owners and frustrate Debtors' efforts to liquidate; and

(d)    The risk of collateral estoppel, stare decisis or adverse evidentiary findings that will impair Debtors' ability to defend themselves in subsequent litigation.

29.    The injunctive relief sought by the Debtors is necessary and proper to continue operating the Facilities in Chapter 11, effectuate the Settlement Agreement, and allow for an unobstructed opportunity to obtain confirmation of a Plan.

30.    If the Pending Actions against Mr. Sherman are enjoined, there is a substantial likelihood that the Debtors will obtain a confirmable Plan.  Without a stay or injunction, the changes of the Debtors achieving a confirmable Plan are extremely low.

31.    The requested injunctive relief will serve the public interest by promoting compliance with the legislative purpose of the automatic stay under Section 362(a) of the Bankruptcy Code and facilitate Debtors' successful sale of assets and Chapter 11 Plan.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 17, 2019
       New York, New York

                                          _/s/ Michael Wyse____
                                          Michael Wyse
                                          Chief Restructuring Officer