# EXHIBIT C

EXECUTION COPY

# SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") dated as of November 20, 2019 is between (A) the following landlord entities: 292 Main Street, LLC; 6060 Armor Road, LLC; 2178 N. Fifth Street, LLC; 101 Creekside Drive, LLC; 4540 Lincoln Drive, LLC; and 26 Cass Street, LLC (collectively, the "Landlord Group"), (B) Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300) ("Orchard Park"); Absolut Facilities Management, LLC ("AFM"); Absolut Center for Nursing and Rehabilitation at Allegany, LLC ("Allegany"); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC ("Aurora Park"); Absolut Center for Nursing and Rehabilitation at Gasport, LLC ("Gasport"); Absolut at Orchard Brooke, LLC ("Orchard Brooke"); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC ("Three Rivers"); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC ("Westfield") (Allegany, Aurora Park, Orchard Brooke, Gasport, Three Rivers, and Westfield collectively referred to herein as the "Operating Debtors"; and the Operating Debtors with AFM, Orchard Park referred to as the "Debtors"), and (C) Israel Sherman.  This Agreement shall be attached to and incorporated into the next interim debtor-in-possession financing and cash collateral order and filed with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") in connection with the hearing on November 20, 2019.

Section 1.  Sale and Marketing Process

1.      The Debtors will hire Senior Living Investment Brokerage on or about November 21, 2019 to run a marketing and sale process in order to locate a replacement operator for the Operating Debtors' facilities.

2.      The Debtors will file a motion to sell substantially all of the assets of the Operating Debtors as a going concern pursuant to section 363 of the Bankruptcy Code, which motion and the bidding procedures shall be in a form and substance reasonably acceptable to the Landlord Group, the Official Committee of Unsecured Creditors (the "Committee"), Capital Finance, LLC ("Capital Finance"), Capital Funding, LLC ("Capital Funding"), and the United States Department of Housing and Urban Development ("HUD" and, together with the Landlord Group, Capital Finance, Capital Funding, and the Committee, the "Consultation Parties"), and contain, among other things, the following provisions (i) a sale and marketing process that permits bids on and sale of (a) all or less than all of the Operating Debtors' assets and (b) all, less than all or none of the Debtors' healthcare receivables (the "Receivables"); (ii) a timeline for the sale of the Debtors' assets other than the Receivables such that entry of a final 363 sale order for each of the Operating Debtors other than with respect to the Receivables (the "Operating Asset Sale Order") is entered on or before January 15, 2020 (which timeline for entry of the Operating Asset Sale Order cannot be extended without the prior consent of the Consultation Parties, and all other dates and deadlines in the bidding procedures relating to the Operating Debtors' assets other than the Receivables and any extension or modification thereof will be subject to the Consultation Parties' consent, not to be unreasonably withheld); (iii) a timeline for the sale of the Receivables such that entry of a final 363 sale order for such Receivables (to the extent the Debtors elect to accept a bid for the Receivables) for the receivables is entered on or before February 28, 2020; (iv) all bids will be shared with the Consultation Parties when received, and the Consultation Parties shall have consultation rights in connection with the evaluation of what

EXECUTION COPY

bids constitute qualified bids and determination of the successful bidder (if any), (v) with respect to any or all of the facilities, a bid of $1 from the Landlord Group or an affiliate, to the extent actually formally submitted, shall be deemed a qualified bid for any assets subject to such bid other than any Receivables (and not for any Receivables) and the Landlord Group (or their affiliate) shall be a qualified bidder under the bidding procedures (the "Landlord Group Qualifying Bid"), *provided that* if a Landlord Group Qualifying Bid is the successful bid for any facility (a) the Landlord Group must pay applicable cure costs relating to any leases or executory contracts for which it seeks assumption and assignment and (b) the operations transfer agreement and all other effectuating sale documents will be assignable by the Landlord Group, (vi) a proposed form of operations transfer agreement for the facilities reasonably acceptable to the Landlord Group (the "Form OTA") and (vii) a procedure for signing up a stalking horse bidder after entry of the bid procedures order.  The motion seeking approval of the bid procedures will be filed so as to be heard by the Bankruptcy Court no later than December 9, 2019. Notwithstanding anything in this Agreement to the contrary, the Debtors may at any time, and in consultation with the Consultation Parties, suspend or terminate the public marketing and sale process in favor of a private sale transaction as contemplated by paragraph 14 of this Agreement. For the avoidance of doubt, while the Debtors will offer the Receivables for sale in connection with the bid procedures contemplated herein, the Debtors are under no obligation to accept any bid for, or to sell, any portion of the Receivables pursuant to such procedures or otherwise.

3.     The Form OTA will contain reasonable benchmarks to be agreed upon by the Landlord Group and the Debtors, in consultation with Mr. Sherman, specifying (a) the date by which the applicable new operator shall be required to have submitted its CHOW application to the State of New York and its Transfer of Physical Assets ("TPA") application to HUD (the CHOW and TPA approval processes for any given facility are collectively the "CHOW Process"), (b) timeframes within which such new operator will be required to respond to any requests for additional information by the State of New York and HUD, and (c) the outside date for closing. The Form OTA will require that, in the event the new operator for an applicable Operating Debtor facility does not timely satisfy such benchmarks within its control, such new operator will be required to pay a reasonable extension fee (in an amount to be agreed upon and specified in the Form OTA) to the applicable Operating Debtor's bankruptcy estate, and any failure to pay such extension fee will constitute a breach.  Israel Sherman reserves the right to request reasonable compensation from the applicable Operating Debtor's bankruptcy estate for any value or services by him resulting from any benchmark which is not timely met or delay in the CHOW Process or any other requisite governmental or regulatory approval process.  The Debtors' independent advisor shall have the discretion to provide any such compensation requested, which request shall be made by application to the Bankruptcy Court and subject to Bankruptcy Court approval.  The Landlord Group and the Committee reserve all rights in connection with any such request, including the right to object thereto.

4.     The proposed bid procedures will require standard terms, including submission of a copy of the operations transfer agreement marked against the Form OTA, payment of cure amounts no later than thirty (30) days after entry of the Sale Order, including all prepetition and post-petition amounts due and owing (including without limitation curing any mechanics lien filed against any Operating Debtors' property in accordance with the applicable lease(s)), and submission of information by prospective buyers to indicate that they (a) have the wherewithal and/or ability to

2

EXECUTION COPY

close and obtain requisite regulatory and other governmental approvals, and (b) can provide adequate assurance of future performance of the lease obligations, including all such obligations during the CHOW Process as provided in paragraph 13 hereof. The bid procedures will not contain any term or provision inconsistent with this Agreement.

5.   Any bidder making a bid on any of the assets (including any potential stalking horse bidder) must, to be deemed a qualified bidder, (a) disclose any agreement reached with any third party, including the Landlord Group, relating to the bid or the continued operation of the facilities, and (b) disclose all persons or entities participating in such bid. For the avoidance of doubt, (a) the Landlord Group shall retain absolute discretion regarding its decision to agree to lease incentives or modifications, including without limitation with respect to any bid that (i) contemplates the assumption of less than all of the Operating Debtors' leases, or (ii) fails to include the *pro rata* share of Percentage Rent (as defined in that certain Omnibus Third Amendment to Operating Leases (the "Third Amendment"), and (b) the Debtors shall not contest their obligations under any of the leases (including amendments or modifications). The Debtors will not file any motion inconsistent with this Agreement in respect of the Landlord Group's properties without the written consent of the Landlord Group. The Landlord Group will disclose within one day of the bid deadline any agreements reached with any actual bidder regarding lease incentives or modifications.

6.   In the event of termination of the OTA (as defined below) as to any facility for any reason, including without limitation due to the failure to satisfy any condition to closing pertaining to licensure and CON approval, any Landlord Group Qualifying Bid for such facility shall be substituted in place of the successful bidder for such facility, subject to the rights of any approved backup bidder under the Sale Order; and provided that if no such backup bidder exists at the time of termination, the Debtors shall have the right to re-market the facility for a period of 30 days (or such longer period as the Landlord Group and the Debtors may reasonably agree), during which time the Debtors will pay rent to the Landlord Group in respect of the applicable lease.

7.   Upon the filing of the sale procedures motion, the Landlord Group will withdraw its motion to appoint a chapter 11 trustee [Docket No. 69] and dismiss with prejudice its adversary proceeding (Adv. Proc. No. 19-08121). The Landlord Group will not file another motion to appoint a trustee absent a material breach by the Debtors of this Agreement. The Landlord Group will consent to entry of a final DIP order approving the full borrowing under the proposed DIP agreement, a good faith finding for the DIP agreement and ABS DIP LLC with respect to the DIP loan in the final DIP order, as well as the payment of reasonable first day relief. Discovery between the Debtors, ABS DIP LLC, and Mr. Sherman, and the Landlord Group shall be suspended between the time of the execution of this Agreement and the withdrawal of the Trustee Motion. The parties will request that the hearing on the Landlord Group's trustee motion and the various items relating to the adversary proceeding will be canceled. The Landlord Group will not object to any retention application for any of the Debtors' proposed professionals that is filed before the date of execution of this Agreement.

8.   Prior to the Debtors seeking Bankruptcy Court approval of any proposed stalking horse bid, they will disclose to the Consultation Parties the terms of any proposed stalking horse bid.

3

EXECUTION COPY

The Landlord Group shall have the right of first refusal to match any stalking horse bid for any or all of the facilities; provided that in the event of any matching by the Landlord Group, the proposed stalking horse shall have the ability to increase or improve the proposed stalking horse bid through cash payments, assumption of liabilities or any other consideration, until such time as the Landlord Group elects no longer to match.  In the event the proposed stalking horse bidder declines to increase or improve its bid after the invocation of the right of first refusal by the Landlord Group, the Landlord Group shall be named the stalking horse bidder.  Unless consented to by the Landlord Group, the DIP lender may not assign (other than to Israel Sherman or an entity as to which Israel Sherman holds management control and in which he holds an interest exceeding 50%) any right to credit bid pursuant to section 363(k) of the Bankruptcy Code for any of the Debtors' assets.

9.      If no qualifying bid is received for any of the Operating Debtor facilities, including a Landlord Group Qualifying Bid, the Debtors shall notify the Consultation Parties at least three (3) business days before submitting any plan of closure to the DOH.

10.     The Debtors shall submit a proposed order to the Bankruptcy Court approving rejection of the Orchard Park lease effective as the date of surrender of the premises that specifically provides that the Landlord Group's right to argue that the leases for all of the Debtors' facilities constitute a single, integrated transaction is not waived and is preserved, and the Debtors' right to argue the opposite is preserved as well.  The Debtors agree to termination of the Orchard Park lease and turnover the Orchard Park facility to the Landlord Group within 1 business day of entry of the order approving rejection of the lease (or such other time agreed to by the Landlord Group and the Debtors).

11.     The Debtors shall submit a proposed order to the Bankruptcy Court approving the Debtors' motion for approval of closure of Orchard Park that provides no more than a single sentence authorizing closure of Orchard Park as follows: "The Debtors are authorized to complete implementation of the Closure Plan."

12.     The Debtors will provide the Landlord Group and its professionals with access to the facilities and information about the Debtors' finances and operations within five (5) calendar days of any request by the Landlord Group or its professionals.

13.     The Debtors represent that none of the Operating Debtors have taken steps towards closure, including, without limitation, the filing of a plan or application of closure.  Until the entry of any applicable Sale Order (and subject to the terms of this Agreement), the Operating Debtors (a) will continue to operate all of their facilities and maintain all licenses (including operating certificates and Medicare numbers) in the ordinary course of business, (b) will not enter into any material contracts, incur any material obligations, or enter into any insider transactions outside the ordinary course of business (other than as may be permitted in the bid procedures order), and (c) will not file any plans of closure with the DOH or take any other steps towards closure.  Further, upon entry of any sale order approving the sale of any of the Operating Debtors' facilities, the Operating Debtors (x) will continue to operate such facility(ies) and maintain all licenses (including operating certificates and Medicare numbers) in the ordinary course of business, (y) will not enter into any material contracts, incur any material obligations,

4

EXECUTION COPY

or enter into any insider transactions outside the ordinary course of business (other than as may be permitted in the bid procedures order), and (z) will not take any steps toward rejection of the lease for such facility(ies), until the transfer of such facility(ies) to the new operator(s) thereof, except for any such facility as to which the applicable OTA (as defined below) has been terminated prior to transfer; provided that, in accordance with usual practice, such new operator(s) (including the Landlord Group or any affiliate or assignee thereof, to the extent such person or entity is the winning bidder) will assume the P&Ls (including all operating expenses) for the applicable facility(ies), including the payment of rent, during the CHOW Process, immediately upon the later to occur of the execution date of the applicable OTA or the entry of a sale order approving such applicable OTA.  In the event such new operator(s) fails to make any payment under the lease(s) when due, and fails to cure such non-payment within five (5) days' written notice thereof by the Landlord Group or the Debtors, the applicable OTA will be terminated.   The deadline for assumption or rejection of the leases under Section 365(d)(4) of the Bankruptcy Code will be extended to a date 30 days after the Final OTA Closing Date (as defined below).  Notwithstanding anything to the contrary in this paragraph 13, at all times the Debtors, in consultation with the Consultation Parties, and subject to approval by the Bankruptcy Court, shall be entitled to pursue and enter into alternative postpetition financing.

14.     Notwithstanding anything in this Agreement to the contrary, the Debtors will in good faith consider proposals for (i) a private sale of substantially all assets of the Operating Debtors other than a sale of the Receivables and (ii) a private sale of the Receivables (any such transaction, a "Private Transaction"), in each case in consultation with the Consultation Parties. The process of considering one or more Private Transactions will be conducted simultaneously with the public sale and marketing process contemplated in paragraph 2 of this Agreement.  In the event a Private Transaction is consummated, all terms of this Agreement shall continue in full force and effect except to the extent of a conflict with this paragraph 14 or any documents effectuating the Private Transaction ("Private Sale Documents").  In the case of a conflict between any terms of this Agreement not set forth in this paragraph 14, on the one hand, and the terms of this paragraph 14 and the Private Sale Documents, on the other hand, the terms of this paragraph 14 and the Private Sale Documents shall control.  For the avoidance of doubt, the Debtors are under no obligation to enter into a Private Transaction as contemplated herein, including, without limitation, any Private Transaction providing for the sale of any Receivables.

Section 2.  Obligations to Pay Post-petition Rent

15.     The Debtors shall pay $300,000 on account of post-petition rent due and owing to the Landlord Group on November 22, 2019.

16.     Beginning on November 22, 2019, for the month of November 2019, and on the first business day of each applicable month thereafter, the Debtors will pay to the Landlord Group (i) full rent on a monthly basis for the Operating Debtors on account of their post-petition rent obligations, plus (ii) $100,000 per month for unpaid post-petition rent due and owing to the Landlord Group until entry of a sale order for such facilities; provided, however, such payments may only be made if the Bankruptcy Court has authorized such use of the Debtors' cash collateral.  Subject to and conditioned on the Debtors' full and timely performance of their payment obligations in this Section 2, the Landlord Group will not seek to compel the Debtors'

5

EXECUTION COPY

performance of their obligations under section 365(d)(3) of the Bankruptcy Code through the date of the execution of this Agreement. Other than as set forth in the immediately preceding sentence, and for the avoidance of doubt, nothing in this Agreement shall be construed to constitute any cap, waiver, or release by the Landlord Group of any claim against the Debtors, including without limitation claims for unpaid pre- and post-petition rent.

17. The Debtors represent and warrant that (i) they have sufficient liquidity to satisfy the foregoing amounts that are payable to the Landlord Group in November 2019 and (ii) to the best of their knowledge, they will have sufficient liquidity to satisfy their remaining monetary obligations to the Landlord Group under this Agreement through and including January 15, 2020.

Section 3.  Cooperation by Israel Sherman

18. Madison SNF, LLC (the parent company of the Landlord Group), and Israel Sherman will enter into a transition services agreement ("TSA") in a form to be approved pursuant to the applicable sale motion, requiring, among other things, Israel Sherman to provide and to cause the Debtors to provide reasonable assistance and cooperation in order to facilitate the due diligence and regulatory approval process, including but not limited to, the CHOW Process, any other applicable New York State or federal licensure/CON/HUD approvals and implementation of operations transfer agreements ("OTA") and administrative services agreements ("ASA") with the new operators for the facilities.

19. In connection with the performance of such duties under the TSA, Madison SNF, LLC shall pay Israel Sherman the sum of $592,500 ("TSA Fee"), which sum shall be inclusive of any out-of-pocket expenses or professional fees incurred by Israel Sherman, with fifty percent (50%) of such fee to be paid in ten equal monthly installments beginning on the first day of the month following entry of the Sale Order(s) for any or all of the Operating Debtors and the remaining fifty percent (50%) paid on the date as of which the transfer to the new Bankruptcy Court approved operator(s) of all of the facilities that are to be sold to a new operator becomes effective pursuant to the OTA (the "Final OTA Closing Date"). The Debtors must disclose by certification to the Landlord Group and the Committee whether the Debtors, or any of their affiliates, members, managers, principals, officers, directors, shareholders, consultants, ultimate owners, or retained professionals are participants in any manner, directly or indirectly, with any party submitting a bid for any of the Operating Debtors' assets. In the event that Israel Sherman, any of his family members, or any insider, affiliate, consultant, ultimate owner, or retained professional of the Debtors is the successful bidder for the Operating Debtor facilities, or is affiliated with the successful bidder, there will be no TSA Fee payable to Israel Sherman in respect of any facilities for which they are the successful bidder, with the reduction in TSA Fee being based pro rata on number of beds. Except as set forth in paragraph 3 herein, Israel Sherman will not seek any increase to the TSA Fee through the bidding procedures or otherwise.

20. On the Final OTA Closing Date, the Landlord Group, Ira Smedra, Abraham Shonfeld and Jacob Wintner (collectively, the "Landlord Release Parties"), on the one hand, and Israel Sherman and Samuel Sherman (the "Sherman Release Parties") shall mutually release one another from any claims arising from the leases or the operation of the facilities, including all

6

EXECUTION COPY

claims arising under guaranties of the Debtors' leases, all claims arising under notes between the parties, and all claims asserted in all of the actions set forth on Schedule A annexed hereto. Any litigation commenced by the Landlord Release Parties, including all of the actions set forth on Schedule A annexed hereto, against the Sherman Release Parties shall be stayed until the earlier of (i) the Final OTA Closing Date, or (ii) a breach by Israel Sherman of the TSA, and dismissed by the Landlord Release Parties (as applicable) with prejudice within ten (10) days following the Final OTA Closing Date. For the avoidance of doubt, other than the releases provided in this paragraph 20, all rights of the Landlord Release Parties and the Sherman Release Parties are expressly preserved. The form of the mutual releases set forth in this paragraph shall be agreed to on or before the date of filing the bidding procedures motion, with signature pages held in escrow pending the Final OTA Closing Date.

21. The TSA will be attached to the applicable sale motion and is subject to approval by the Court. The TSA will be executed prior to the entry of the bidding procedures order or private sale order, as applicable, with the signature page in escrow pending bankruptcy approval. The parties understand that in the event modification of the TSA is required to obtain bankruptcy court approval, Mr. Sherman and the Landlord Group will use best efforts to agree to a mutually agreeable form of TSA. The TSA shall be of no force or effect unless agreed by all parties and approved by the Court.

[*SIGNATURES BEGIN ON FOLLOWING PAGE*]

EXECUTION COPY

IN WITNESS OF their understanding and agreement, the parties have executed this Agreement by signature of a duly authorized individual on the date set forth above.

**DEBTORS:**

**ABSOLUT FACILITIES MANAGEMENT, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT AURORA PARK, LLC**

**ABSOLUT AT ORCHARD BROOKE, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ORCHARD PARK, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ALLEGANY, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT THREE RIVERS, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT GASPORT, LLC**

**ABSOLUT NURSING AND REHABILITATION CENTER OF WESTFIELD, LLC**

By: _____
Name: Michael Wyse
Title: CRO

**ISRAEL SHERMAN**

_____

18473293.5
233620-10001

EXECUTION COPY

    IN WITNESS OF their understanding and agreement, the parties have executed this Agreement by signature of a duly authorized individual on the date set forth above.

                             **DEBTORS**:

                             **ABSOLUT FACILITIES MANAGEMENT, LLC**

                             **ABSOLUT CENTER FOR NURSING AND REHABILITATION AT AURORA PARK, LLC**

                             **ABSOLUT AT ORCHARD BROOKE, LLC**

                             **ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ORCHARD PARK, LLC**

                             **ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ALLEGANY, LLC**

                             **ABSOLUT CENTER FOR NURSING AND REHABILITATION AT THREE RIVERS, LLC**

                             **ABSOLUT CENTER FOR NURSING AND REHABILITATION AT GASPORT, LLC**

                             **ABSOLUT NURSING AND REHABILITATION CENTER OF WESTFIELD, LLC**

                             By:_____
                             Name:_____
                             Title:_____

                             **ISRAEL SHERMAN**
                             _____

8

18473293.5
233620-10001

EXECUTION COPY

**LANDLORDS:**

**292 MAIN STREET, LLC**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By: _____
Name: IRA SMEDRA
Title: MANAGER

**CONSENTED TO BY:**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

By: _____
Name: _____
Title: _____

**AGREED SOLELY AS TO PARAGRAPH 20:**

_____
Ira Smedra

_____
Abraham Shonfeld

_____
Jacob Wintner

_____
Samuel Sherman

9

18473293.5
233620-10001

EXECUTION COPY

LANDLORDS:

292 MAIN STREET, LLC

6060 ARMOR ROAD, LLC

2178 N. FIFTH STREET, LLC

101 CREEKSIDE DRIVE, LLC

4540 LINCOLN DRIVE, LLC

26 CASS STREET, LLC

By:_____
Name:_____
Title:_____

CONSENTED TO BY:

OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

By: *Isaac Newman /C/KK*
Isaac Newman, Chief Operating Officer of
DentServ Dental Services, P.C.
Chairperson of the Committee

AGREED SOLELY AS TO PARAGRAPH 20:

_____
Ira Smedra

_____
Abraham Shonfeld

_____
Jacob Wintner

_____
Samuel Sherman

9

18473293.5
233620-10001

EXECUTION COPY

**LANDLORDS:**

**292 MAIN STREET, LLC**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By:_____
Name:_____
Title:_____

**CONSENTED TO BY:**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

By:_____
Name:_____
Title:_____

**AGREED SOLELY AS TO PARAGRAPH 20:**

Ira Smedra

Abraham ~~Shonfeld~~ SCHONFELD

Jacob Wintner

Samuel Sherman

9

18473293.5
233620-10001