**LOEB & LOEB LLP**
Schuyler G. Carroll
William M. Hawkins
Evan K. Farber
Mary Jean Kim
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 407-4990
Email: scarroll@loeb.com
       whawkins@loeb.com
       efarber@loeb.com
       mjkim@loeb.com

*Counsel to the Debtors*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 19-76260 (AST) |
| | ) | Case No. 19-76263 (AST) |
| In re: | ) | Case No. 19-76267 (AST) |
| | ) | Case No. 19-76268 (AST) |
| Absolut Facilities Management, LLC, *et al.* | ) | Case No. 19-76269 (AST) |
| | ) | Case No. 19-76270 (AST) |
| Debtors.[1] | ) | Case No. 19-76271 (AST) |
| | ) | Case No. 19-76272 (AST) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

---

[1]  The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

|   |   |   |
|---|---|---|
| _____ | ) | |
| | ) | |
| Absolut Facilities Management, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Chapter 11 |
| v. | ) | |
| | ) | |
| Mark LaSurk as Administrator of the Estate of | ) | Adv. Pro. No. 8:19-AP--08155 |
| Rhonda LaSurk, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

Absolut Facilities Management, LLC ("**Absolut Management**") and its affiliated debtor entities (collectively, the "**Absolut Facilities Operators**" and each an "**Absolut Facility Operator**"),[2] as debtors and debtors-in-possession (collectively, the "**Debtors**" and each a "**Debtor**") in the above-captioned jointly administered Chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this memorandum of law, together with the December 17, 2019 Declaration of Michael Wyse ("**Wyse Decl.**") and exhibits thereto, in support of their motion for a preliminary injunction barring prosecution of the state court action entitled *LaSurk v. Absolut Facilities Management, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, et al.*, Index No. 805925/2016; New York Supreme Court, Erie Cty. (hereinafter the "**LaSurk Action**") by plaintiff therein ("**Plaintiff**") as against defendant Israel Sherman ("**Mr. Sherman**"), pending a determination of the relief requested herein, which relief includes: (1) an order enforcing the automatic stay of Bankruptcy Code § 362 and declaring that prosecution of the LaSurk Action by Plaintiff as against Mr. Sherman violates the stay that is currently in place in these Chapter 11 Cases; (2) an order extending the automatic stay to encompass and enjoin the prosecution of the LaSurk Action as against Mr. Sherman pursuant to Bankruptcy Code § 362; or (3) an order enjoining the prosecution of the LaSurk Action as against Mr. Sherman pursuant to Bankruptcy Code § 105.

## PRELIMINARY STATEMENT

Prior to the petition date, numerous state court lawsuits were filed against the Debtors,

---

[2] The Absolut Facilities Operators are the following Debtors: Absolut Center for Nursing and Rehabilitation at Westfield, LLC, Absolut Center for Nursing and Rehabilitation at Allegheny, LLC, Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC, Absolut Center for Nursing and Rehabilitation at Gasport, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC, and Absolut at Orchard Brooke, LLC.

generally by individuals or the executors of their estates, and generally asserting personal injury or wrongful death claims. Many of these lawsuits also named as defendants individuals affiliated with the Debtors, including Israel Sherman, who is the Debtors' principal owner and CEO. The plaintiffs in these actions typically name Mr. Sherman as a defendant pursuant to New York Public Health Law § 2808-a, which provides that a "controlling person" of a residential health care facility may be held personally liable for certain claims "to the same extent" as the facility itself.

Upon the filing of the petition and the imposition of the automatic stay, the plaintiffs in most of these actions have tacitly acknowledged – or at least acted in accordance with a tacit acknowledgment – that their cases are automatically stayed not only against the Debtors, who are the direct defendants in those cases, but also against Mr. Sherman, whose liability is wholly derivative of the Debtors' liability under the statutory "to the same extent" language. However, recently, the Plaintiff in the LaSurk Action has taken a different path. Last month and earlier this month, that Plaintiff sent correspondence taking the position that the case can move forward to a trial – which is currently scheduled for the end of January 2020 – as against Mr. Sherman, even as the "meat" of the case is stayed as against the Debtors themselves. Moreover, just last week, the LaSurk Plaintiff filed an order to show cause in the state court seeking to sever the LaSurk Action as against Mr. Sherman for the purpose of commencing trial against him alone.

The continued prosecution of the LaSurk Action, even against Mr. Sherman alone, is a clear, immediate, and *per se* violation of the automatic stay. The text of Public Health Law § 2808-a and caselaw interpreting that statute uniformly make clear that it is impossible to make a finding of liability against a controlling person (i.e., allegedly Mr. Sherman) without previously or simultaneously making a finding of liability against the residential health care facility itself (i.e., one of the Debtors). Thus, prosecution of the action against Mr. Sherman in his capacity as a

Debtor's alleged "controlling person" necessarily requires a determination of liability against the Debtor. That is a clear and present stay violation.

Even if Plaintiff's actions were not a stay violation, the Court should extend the stay under Bankruptcy Code § 362 to enjoin further prosecution of the LaSurk Action against Mr. Sherman. Under binding Second Circuit precedent, the automatic stay is regularly extended to apply to non-debtors when the claim against the non-debtor would otherwise have "an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Intl.*, 321 F.3d 282 (2d Cir. 2003). That is the case here, for multiple reasons: because a finding of liability against Mr. Sherman under § 2808-a necessarily entails a finding of liability against a Debtor; because most of the Debtors are required, under their Operating Agreements, to indemnify Mr. Sherman; because Mr. Sherman is a co-insured with the Debtors under a policy with a joint cap on coverage, meaning that both his defense costs and coverage for any judgment against him will deplete the amount of insurance coverage left for the Debtors; and because defending the LaSurk Action would distract Mr. Sherman's attention from efforts to resolve these Chapter 11 Cases, imperiling the marketing, due diligence, sales, and transition process which is currently contemplated. Worse yet, if the LaSurk Action is permitted to go forward, the rest of the state court plaintiffs (most of whom are represented by the same law firm) will undoubtedly follow right behind. Moreover, Mr. Sherman will inevitably need to lean heavily upon the Debtors' resources – at a minimum, for evidence and witnesses – in defending himself in these state court cases.

Finally, the Court should also enjoin the further prosecution of the LaSurk Action against Mr. Sherman pursuant to § 105 of the Bankruptcy Code. As set forth below, all of the traditional preliminary injunction factors in the bankruptcy context all squarely support the imposition of a preliminary injunction in this situation. First, a Chapter 11 plan is likely to be successful only if

Mr. Sherman is not distracted by these lawsuits from his responsibilities for overseeing the Debtors' marketing, due diligence, and transfer to new ownership. Second, the Debtors will suffer immediate irreparable harm in the absence of an injunction, for the same reasons as set forth above. Third, the balance of harm strongly favors an injunction; the LaSurk Action does not seek time-sensitive relief, so a delay of its prosecution is of reduced significance. Finally, the public interest here favors an injunction – both the public interest in the successful resolution of these Chapter 11 Cases and, critically, the interests of the hundreds of residents of the residential health care facilities operated by the Debtors. Accordingly, the Court should enjoin the further prosecution of the LaSurk Action against Mr. Sherman.

## STATEMENT OF FACTS

### I.    The Debtors

The Debtors are the in business of operating skilled nursing and assisted living facilities in New York State (collectively, the "**Facilities**" and each a "**Facility**"). As of the September 10, 2019 petition date (the "**Petition Date**"), the Debtors – Absolut Management and the Absolut Facilities Operators – operated six Facilities. *See* Wyse Decl. ¶ 4.

Absolut Management and the Absolut Facilities Operators are New York limited liability companies. Absolut Management acts as the main operating entity of the Debtors' business and is the manager ("**Manager**") of each of the Absolut Facilities Operators pursuant to their respective operating agreements (the "**Operating Agreements**" and each an "**Operating Agreement**"), which were each entered into prior to the Petition Date. *See id.* ¶ 5; Ex. A (Absolut Management Operating Agreement); Ex. B (Orchard Park Operating Agreement) § 5.4.[3] Mr. Sherman is the

---

[3] As used herein, "Ex. __" refers to exhibits to the Wyse Decl. Each of the Absolut Facilities Operators has an LLC Operating Agreement which was entered into prior to the Petition Date, and they are nearly identical to each other. *See* Wyse Decl. ¶ 6. The Operating Agreement attached

sole managing member of Absolut Management.  *See* Ex. A § 1.1.21.  Mr. William K. Lenhart is

the independent advisor to Absolut Management.[4]

Each of the Absolut Facilities Operators consist of the following members and membership

interests:  Absolut Management (54%), Mr. Sherman (45%), and Samuel Sherman (1%).  *See* Ex.

B at Schedule A.  Mr. Sherman is the CEO of each Absolut Facilities Operator.  Mr. Sherman is,

and has, at all pertinent times been, an employee of each Absolut Facilities Operator.  *See* Wyse

Decl. ¶ 6.

## II.    <u>The Status of the Chapter 11 Cases</u>

Since the Petition Date, the Debtors have streamlined their business operations by closing

the Orchard Park Facility pursuant to a closure plan approved by the New York State Department

of Health and this Court.  As of the third quarter of 2019, the Debtors employed over 1,100 full

and part time staff members to deliver services and care to over 700 patients and residents at the

six remaining Facilities.  Each of the Facilities is staffed 24-hours per day, seven days per week,

365-days per year.  *See* Wyse Decl. ¶¶ 7-8.

The Debtors have expended considerable time, effort, and resources vigorously negotiating

a settlement over the last several months that would provide for a possible sale of the Debtors'

operations and accounts receivables.  On November 22, 2019, the Debtors filed a motion (Docket

---

as Exhibit B to the Wyse Decl. is a copy of the Operating Agreement of Absolut Center for Nursing
and Rehabilitation at Orchard Park, LLC ("**Orchard Park**"), dated as of February 16, 2006.
Orchard Park is the Absolut Facility Operator named as a defendant in the LaSurk Action.  The
Orchard Park Operating Agreement also serves as an exemplar of each of the Operating
Agreements.

[4] If the Debtors had been corporations, Mr. Lenhart would have been appointed as an Independent
Director.  Each of the Debtors, however, is a member managed LLC, and their organizational
documents do not permit the appointment of an Independent Director.  Accordingly, Mr. Lenhart
was appointed to the title of "Independent Advisor."  This title is intended to be identical to the
title of Independent Director, and the terms of his engagement are consistent with that role.

No. 268, the "**Settlement Motion**"), seeking approval of a November 20, 2019 Settlement Agreement among the Debtors, Debtors' landlords, and Mr. Sherman (the "**Settlement Agreement**"). Pursuant to the Settlement Agreement, the Debtors agreed to an expedited and robust sale process that includes a bifurcated timeline for the sale of the Facilities separate from the sale of their accounts receivables. Therefore, contemporaneously with filing the Settlement Motion, the Debtors filed a separate motion (Docket No. 269, the "**Sale Motion**"), seeking approval of the sale processes contemplated by the Settlement Agreement. *See* Wyse Decl. ¶ 9.

The Court held a hearing on the Settlement Motion and the Sale Motion on December 9, 2019, at which the Court approved the Settlement Agreement and the proposed process for the sale of the Debtors' assets. *See id.* ¶ 10, Ex. C.

As the CEO of the Debtors, Mr. Sherman's continued cooperation is critical to the Settlement Agreement. First, Mr. Sherman must be available throughout the sale processes to respond to the Debtors' investment banker and potential purchasers concerning diligence requests and other inquiries, all while continuing to oversee the Debtors' operations and the provision of care to the residents of the Facilities. Although the Debtors recently added certain personnel, such as Mr. Wyse, Mr. Hoffman and Mr. Lenhart, Mr. Sherman is truly the key to the Debtors' operations and employees. As is typical in any company struggling through distressed times, particularly one that has filed bankruptcy and is in the midst of an expedited sale process, the Debtors have been challenged to avoid problems with employee morale. This is particularly true in these cases because each and every employee's work is vital to providing the residents the high quality experience they expect – not to mention to ensuring their safety, protection and medical care. Indeed, if just one employee fails to execute his or her duties timely and properly, it could mean life or death for a resident. Despite these challenges, as recognized by the Patient Care

Ombudsman and the NY State Department of Health, the Debtors have continued to provide high quality care to the residents.  *See* Wyse Decl. ¶¶ 11-12; Ex. C at ¶ 18.

This high quality of care is thanks to Mr. Sherman's efforts, and his oversight is critical to ensuring that it continues.  Mr. Sherman's hands-on approach and wealth of experience in health care administration allows him to create an excellent working environment.[5]  He has a long history with the Debtors and working with the employees.  None of the new individuals have any prior relationships with the business or the employees.  So, uniquely, Mr. Sherman's relationships allow him to ensure the cooperation of employees and continued quality care.  *See* Wyse Decl. ¶ 13.

In addition, as set forth in the Sale Motion, once the Debtors select a proposed purchaser or purchasers for the Facilities, the purchaser or purchasers will need to obtain regulatory and governmental approvals prior to taking over operations of the Facilities.  To obtain such approval, it will be necessary for Mr. Sherman to provide substantial assistance and cooperation and to facilitate the due diligence and regulatory approval process.  In particular, any proposed purchaser will require Mr. Sherman's assistance while any "Change of Ownership" application relating to any of the Facilities is pending with the State of New York, any Transfer of Physical Assets application is pending with HUD, and any other required New York State or federal licensure applications are pending.  Pursuant to the terms of the Settlement Agreement, Mr. Sherman has committed to providing this assistance and cooperation and to facilitating the transfer of operations of the Facilities.  Ultimately, upon the closing of any such transactions, Mr. Sherman must provide releases.  *See id.* at ¶ 14; Ex. C at ¶¶ 18-21.

---

[5] Mr. Sherman received an MBA in Health Care Administration from Baruch College/Mt. Sinai School of Medicine in 1979.  Since then, he has worked almost exclusively in the area of senior health care administration.  Mr. Sherman has been licensed by the New York State Department of Health as an owner and operator since 2006.  His extensive experience includes work in senior level administration roles at more than 20 senior care facilities.  *See* Wyse Dec. ¶ 13 n.3.

### III.     **The Pending State Court Lawsuits**

Prior to the Petition Date, numerous state court civil proceedings were filed by individuals or the executors of their estates against one or more of the Debtors, arising from events alleged to have occurred at the Facilities.  The plaintiffs in these actions generally assert claims of personal injury, wrongful death, and/or the deprivation of certain enumerated rights of residents as set forth in New York Public Health Law § 2803-c against one or more of the Debtors.  In approximately 30 of these cases (the "Pending Actions"), the plaintiffs also assert claims against Mr. Sherman, but generally not based on any actions or omissions he personally took; instead, these plaintiffs allege that Mr. Sherman is liable for the Debtors' alleged acts or omissions because he is the Debtors' "controlling person" as defined in Public Health Law § 2808-a.  *See* Wyse Decl. ¶ 18. And the liability of a "controlling person" under § 2808-a exists only "***to the same extent*** as [that of the] residential health care facility."  N.Y. Public Health Law § 2808-a(1) (emphasis added).

Upon the filing of the petition and the imposition of the automatic stay, the plaintiffs in most of the Pending Actions have not attempted to move their cases to trial, and thus appear through their actions to have tacitly acknowledged that the Pending Actions are automatically stayed in their entirety.  However, recently, the Plaintiff in the LaSurk Action has sent correspondence taking the position that the LaSurk Action can move forward to trial in January 2020 as against Mr. Sherman, even as the remainder of the case is stayed as against the Debtors themselves.  Moreover, just last week, the LaSurk Plaintiff filed an order to show cause in the state court seeking to sever the LaSurk Action as against Mr. Sherman for the purpose of commencing trial against him alone.  *See* Wyse Decl. ¶¶ 19-23; Exs. F, G, H, I.

### IV.     **The Pending Actions Are Depleting Debtors' Estates**

Regardless of the merits of their claims, permitting the Pending Actions to move forward will result in inefficient litigation that will deplete estate assets, misdirect management attention,

severely harm the Debtors' ongoing business operations, and jeopardize the Debtors' ability to confirm a Chapter 11 plan.

### A.    Debtors' Operating Agreements Require Them to Indemnify Mr. Sherman

Each of the Absolut Facilities Operators has an obligation to indemnify and hold Mr. Sherman harmless "from and against all claims and demands whatsoever," subject only to the limitations of New York law.  New York's Limited Liability Company Law authorizes broad indemnification and hold-harmless provisions in favor of "any person."  The only limitation is that no such indemnification may go to a person against whom an adverse "judgment or other final adjudication" has determined that his material acts were in "bad faith" or "the result of active and deliberate dishonesty" or if "he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled."  N.Y. L.L.C. Law § 420 (McKinney 2019).

In keeping with the statute, each of the Operating Agreements contains a substantially identical indemnification provision, § 5.8, which is entitled Indemnity of the Manager and Others.  Under this section, each Operating Agreement provides as follows:

> [T]he Company will to the maximum extent permitted . . . (a) *indemnify the Manager* [Absolut Management] and *hold its individual members harmless from and against any and all claims and demands whatsoever*, and (b) make advances to [Absolut Management] for all costs, attorneys' fees and expenses of litigation with respect to such indemnifying and holding [Absolut Management] harmless . . . . The Company *will indemnify its employees* and other agents . . . as approved by [Absolut Management].

*See* Ex. B (Orchard Park Operating Agreement), at § 5.8.

Thus, § 5.8 requires indemnification of Mr. Sherman in two ways.  First, each Absolut Facility Operator must hold the "individual members" of the Manager harmless.  Because the "Manager" is Absolut Management and Mr. Sherman is its only member, the Absolut Facilities Operators are required to hold Mr. Sherman harmless "from and against any and all claims and demands whatsoever."  *Id.*  Second, each Absolut Facility Operator "will indemnify" its

employees.  As CEO, Mr. Sherman is an employee of each Absolut Facility Operator and thus qualifies for indemnification in this way too.  *See* Wyse Decl. ¶ 25; Ex. B § 5.8

### B.  Mr. Sherman Is a Co-Insured Under Debtors' Relevant Insurance Policy

As is relevant to the LaSurk Action, the Debtors are insured by the Aging Services Claims Made Policy dated August 11, 2015, issued by JLT Reinsurance Brokers Ltd. for Underwriters at Lloyd's, London (with all schedules and endorsements, the "**Policy**").  *See* Wyse Decl. ¶ 27; Ex. J.  This is a "claims made and reported" policy, so claims reported between July 9, 2015 and July 8, 2016 are covered under Policy.  *See id.* at Declarations, p. 3.  The LaSurk Action, which was initially filed on June 3, 2016, is thus subject to the Policy.  *See* Ex. D.[6]

The "Insureds" under the Policy include each of Absolut Management, the Absolut Facilities Operators, and any "members," "managers" and "Executive Officers" of Absolut, such as Mr. Sherman.  *See* Ex. J (Policy), at § II.17.A.3-4, p.5 and Named Insured Endorsement.  Mr. Sherman is thus an additional named co-insured under the Policy, which has been in effect since before the Petition Date.

The Policy provides coverage, including professional and general liability, for the "Insureds."  *See* Ex. J (Policy) at Declarations, p.3.  The coverage extends to losses and compels the respective Insurers to defend any covered claim.  *See id.*  The locations of the events giving rise to covered Claims include the Facilities.  *See id.* at Schedule of Locations.  The Policy provides an overall aggregate limit of $10,000,000, with other, lower aggregate limits for specific claim types.  *See id.* at Item 4, Declarations, p. 3.  For example, the aggregate limit for professional or general liability claims is $3,000,000.  *See id.*  Further, the Policy imposes a limit on coverage for

---

[6] With regard to claims made during other time periods, which include claims in some of the other Pending Actions, the Debtors are insured by other "claims made and reported" policies which are similar in most respects, though not identical, to the Policy at issue here.  *See* Wyse Decl. ¶ 27.

each claim or occurrence of $1,000,000.  *See id.*[7]

Under the Policy, any coverage extended and Claim paid for, or to, any Insured reduces the amount of coverage available to the other Insureds under the Policy's aggregate limits.  *See* Ex. J (Policy) at § III.A.8, p. 14 ("The Limit of Liability . . . shall apply regardless of the number of persons or entities included within the definition of Insured . . .").  Accordingly, if a loss payment is made against a covered claim – even if only against Mr. Sherman – under the Policy, the overall aggregate coverage limit, the "per claim" aggregate limit, and the per category aggregate limit, would be reduced dollar-for-dollar under the Policy for the other Insureds.  In addition, under the Policy, defense costs also draw down on the aggregate limits of coverage.  *See id.* at § III.A.10, p. 14.  In other words, any payment in defending or covering Mr. Sherman would reduce in equal measure the coverage available for the Debtors, both on that claim and under one or more of the other aggregate limits for the Policy.

## **ARGUMENT**

I.    **THIS COURT SHOULD ISSUE AN ORDER DECLARING THAT PROSECUTING THE LASURK ACTION VIOLATES THE AUTOMATIC STAY**

Plaintiff's prosecution of the LaSurk Action against Mr. Sherman is an immediate, *per se* violation of the automatic stay.  This is so because Plaintiff seeks liability against Mr. Sherman under N.Y. Pub. Health Law § 2808-a, which allows liability against a "controlling person" only "*to the same extent* as [against a] residential health care facility" (emphasis added).  Caselaw makes clear that it is thus legally impossible to determine liability against Mr. Sherman without also determining liability against the Debtors.  And that violates Debtors' automatic stay.

---

[7] The Policy also imposes a self-insured retention on the Insureds for professional or general liability claims of $250,000 per claim, with additional aggregate limits on the self-insured retention under each Policy.  *See* Ex. J (Policy) at Item 5, Declarations, p. 3.

Plaintiff's Amended Complaint alleges only a very limited set of substantive allegations against Mr. Sherman:

(a)     He "was an Administrator and/or Chief Executive Officer" of the Debtors, *see* Ex. E (Amended Complaint), ¶ 7;

(b)     He "is and/or was a controlling person for [Debtors] pursuant to New York State Public Health Law § 2808-a," *see id.* ¶ 8; and

(c)     He "owned, operated[,] managed, directed, administered, and/or assumed responsibility" for Debtors, *see id.* ¶ 11.

In short, Plaintiff's theory of personal liability against Mr. Sherman rests entirely on his role as the "controlling person" of the Debtors.  Thus, Plaintiff is bound by his assertion that Mr. Sherman is the Debtors' controlling person and is subject to Public Health Law § 2808-a.

Public Health Law § 2808-a(1) regulates the liability of "a controlling person of any residential health care facility."  Under that provision, if the residential health care facility is liable for any damages under Article 28 of the Public Health Law, the controlling person "shall also be liable, jointly and severally, with and ***to the same extent as such residential health care facility***." *Id*. (emphasis added).

This statute thus requires Plaintiff to establish the fact and amount of liability against the Debtors before – or simultaneously with – determining any liability of Mr. Sherman.  New York courts have recognized that it is impossible to fix liability against a controlling person under § 2808-a without also fixing liability against the residential health care facility itself.  *See, e.g., Niagara Mohawk Power Corp. v. Salerno,* 20 A.D.3d 142, 144-45 (4th Dep't 2005) (liability of a controlling person exists only if first established against the residential health care facility, because any such liability can only be to the "same extent") (citation omitted); *Sunrest Props. LLC v. Sunrest Nursing Home*, 2005 NYLJ LEXIS 4140, *11 (Sup. Ct. Nassau Cty., Sept. 6, 2005) ("Public Health Law 2808-a does not, however, create a separate or new cause of action.  It makes

the controlling person personally liable for damages sustained by a person asserting a claim under one of the substantive provisions of Public Health Law Article 28.")

The determination of liability against the Debtors, which is thus a necessary precondition to a determination of liability against Mr. Sherman under § 2808-a, would violate the automatic stay. Indeed, § 362(a)(6) of the Bankruptcy Code expressly stays "any act to . . . assess . . . a claim against the [Debtors] that arose before the [Commencement Date]." Section 362(a) of the Bankruptcy Code immediately enjoins state court actions, like the LaSurk Action, which violate the automatic stay.

*In re St. Vincents Catholic Med. Ctrs.*, 429 B.R. 139 (Bankr. S.D.N.Y. 2010), is directly on point. In that Chapter 11 case, the debtors were a hospital and a group of clinics. They sought to close the hospital, and a group of plaintiffs filed a state court action against not the debtors, but the New York State Department of Health, seeking an order requiring the Department of Health to stop the closure. The Bankruptcy Court ruled that that state court action violated the automatic stay because it sought to exercise control over property of the estate:

> **The State Court Plaintiffs violated the automatic stay by bringing the State Court Action** that sought to exercise control over property of the estate. **Although the State Court Action** was brought against the New York State Department of Health and **did not name the Debtors, this technicality does not insulate the State Court Plaintiffs from 11 U.S.C. § 362(a)(3).**

*Id*. at 146 (emphasis added).

In this case, too, although the state court Plaintiff is not seeking a trial against the Debtors, it nevertheless violates the automatic stay. Accordingly, this Court should enforce the stay and issue an order declaring that any prosecution of the LaSurk Action against Mr. Sherman is an immediate, *per se* violation of the automatic stay.

## II. ALTERNATIVELY, THE COURT SHOULD EXTEND THE BANKRUPTCY STAY TO BAR PROSECUTION OF THE LASURK ACTION AGAINST MR. SHERMAN

### A. Any Judgment Against Mr. Sherman Will Have an "Immediate Adverse Economic Consequence" on the Debtors

If the Court does not determine that prosecution of the LaSurk Action against Mr. Sherman is a violation of the automatic stay, it should extend the automatic stay under § 362(a) to encompass and enjoin further prosecution of the LaSurk Action against Mr. Sherman.[8]

The touchpoint for this analysis is the Second Circuit's seminal decision in *Queenie, Ltd. v. Nygard Intl.*, 321 F.3d 282 (2d Cir. 2003). *Queenie* held that the automatic stay applied to a debtor's wholly owned corporation, a factual situation largely similar to (if reversed from) the situation here, where the Debtors are wholly (or nearly wholly) owned by the person in question on this motion. The Circuit explained the applicable standard as follows:

> The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate. Examples are a claim to establish an obligation of which the debtor is a guarantor, a claim against the debtor's insurer, and actions where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant."

*Id*. at 287-88 (citations omitted).

Here, any claim under § 2808-a against Mr. Sherman will undoubtedly have "an immediate

---

[8] The traditional preliminary injunction analysis is not necessary for purposes of this argument, as it was not for purposes of the argument in Section I. Where debtors move under § 362, courts have held that "it is not necessary for [the debtor] to establish each of the factors necessary to impose a preliminary injunction because the Bankruptcy Code itself establishes the basis for enforcement of the automatic stay." *True Health Diagnostics LLC v. Azar (In re THG Holdings LLC)*, 604 B.R. 154, 162 (Bankr. D. Del. 2019). Similarly, *Queenie, Ltd. v. Nygard Intl.*, 321 F.3d 282 (2d Cir. 2003), dispensed with a traditional preliminary injunction analysis in determining when the automatic stay should be extended to non-debtors. All that said, however, the traditional preliminary injunction standards are set forth in Section III below, and if the Court determines that those standards apply here, the Debtors respectfully submit that they are easily met, for substantially the same reasons as set forth below in Section III.

adverse economic consequence for the debtor's estate."  This is true, first and foremost, for the reasons articulated in the foregoing section:  that a finding of liability against Mr. Sherman under § 2808-a necessarily entails a finding of liability against the Debtors – in the statute's own words, "*to the same extent*."  Courts thus recognize that in situations like here, "where [the] debtor's liability [i]s 'automatic and co-extensive' with [a] non-debtor defendant's liability, the automatic stay extend[s] to non-debtor because 'a claim against [the non-debtor] will, when entered, constitute a claim (and hence, an "immediate adverse economic consequence") against [the debtor's] estate.'"  *Durr Mech. Constr., Inc. v. I.K. Constr. Inc. (In re Durr Mech. Constr., Inc.)*, 604 B.R. 131, 137 (Bankr. S.D.N.Y. 2019) (quoting *Tenas-Reynard v. Palermo Taxi Inc.*, No. 14 CIV. 6974 (PGG), 2016 U.S. Dist. LEXIS 42423, at *6 (S.D.N.Y. Mar. 30, 2016)).

*Queenie* closely followed the Fourth Circuit's decision in *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986), which put this point even more finely.  *Robins* reasoned that where "a debtor and nondebtor are so bound by statute or contract that the liability of the nondebtor is imputed to the debtor by operation of law, then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code."  *Id*. at 999 (citation omitted).  That is precisely the situation here, where § 2808-a expressly provides that Mr. Sherman's liability extends "to the same extent" as that of the Debtors.  In such situations, *Robins* held, "[c]learly the debtor's protection must be extended to enjoin litigation against others."  *Id*. (citation omitted).

Even if somehow the coextensive liability under § 2808-a were not at issue, the *Queenie* standard is nevertheless satisfied, because of the Debtors' indemnification obligations to Mr. Sherman, his status as a co-insured under the relevant insurance Policy, and his role as the Debtors' CEO, requiring his engagement to develop and effect a successful Chapter 11 plan here.

Accordingly, the Court should extend the automatic stay to enjoin prosecution of the LaSurk Action against Mr. Sherman, at least through the effective date of any Chapter 11 plan in these Chapter 11 Cases.

### B.    Debtors' Obligations to Indemnify Mr. Sherman Requires Extension of the Stay to Him

As described above, the Operating Agreements of the Absolut Facilities Operators, each of which is a Debtor here, uniformly provide that each Debtor "will indemnify" Mr. Sherman "from and against all claims and demands whatsoever."  Ex. B (Orchard Park Operating Agreement) § 5.8.   These provisions require indemnification of Mr. Sherman both in his capacity as an "individual member" of Absolut Management and in his capacity as an employee (and CEO) of the Absolut Facilities Operators.  *See id*.  The Operating Agreements' sole limitation on this indemnification requirement arises under New York Limited Liability Company Law § 420, which prohibits indemnification of someone against whom an adverse "judgment or other final adjudication" has determined that his or her material acts were in "bad faith" or "the result of active and deliberate dishonesty" or if "he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled."

Ever since the Second Circuit's decision in *In re Baldwin-United Corp. Litig.*, 765 F.2d 343 (2d Cir. 1985), courts in this Circuit have repeatedly affirmed that the automatic stay should extend to cover non-debtors who have indemnity rights against the debtors.   In *Baldwin*, the Second Circuit reversed a district court's decision that prevented non-debtors from seeking an extension of the automatic stay, in large part due to the non-debtors' potential indemnification claims against the debtors.  The court reasoned that "[i]f the applicability of the stay to contribution and indemnity claims . . . arising out of pre-petition conduct is determined in various district courts throughout the country, the ability of the Bankruptcy Court to assure equality of treatment among

creditors will be seriously threatened." *Id*. at 349.

This reasoning has been consistently applied in this Circuit. For instance, in *Robert Plan Corp. v. Liberty Mut. Ins. Co.*, No. 09-CV-1930 (JS), 2010 U.S. Dist. LEXIS 27200, at *7-11 (E.D.N.Y. Mar. 23, 2010), the court held that *Queenie*'s "immediate adverse economic consequence" standard was satisfied where the debtor would be required to indemnify the non-debtors whether they won or lost their lawsuit, provided that "they acted in good faith." Moreover, the court found, "because the Debtors have already pledged to indemnify the Officers, a claim against the Officers will, when entered, constitute a claim (and hence, an 'immediate adverse economic consequence') against the estate." *Id*. at 10; *see also, e.g., Durr*, 604 B.R. at 138 ("the motion to extend the automatic stay is granted" based on the non-debtors' indemnification rights against the debtor); *Tenas-Reynard*, 2016 U.S. Dist. LEXIS 42423, at *15 ("the automatic stay extends to claims against [an indemnitee], because "a claim against [the indemnitee] will, when entered, constitute a claim (and hence, an 'immediate adverse economic consequence') against [the debtor's/indemnitor's] estate"); *In re N. Star Contracting Corp.*, 125 B.R. 368, 370-71 (S.D.N.Y. 1991) ("an identity of interest exists between a debtor and a third party non-debtor when a right to indemnification exists. . . . a special circumstance exists because a judgment against the non-debtor will affect directly the debtor's assets"); *In re Lomas Fin. Corp.*, 117 B.R. 64, 68 (S.D.N.Y. 1990) ("the Bankruptcy Court appropriately stayed the action against a non-debtor third party pursuant to § 362(a)(1)" where "it is undisputed that Lomas' corporate charter contains an indemnification clause, obligating Lomas to indemnify its officers for all legal claims arising out of acts performed in their capacity as Lomas officers").

The Fourth Circuit in *Robins* (which *Queenie* cited with approval, *see* 321 F.3d at 288) held straightforwardly that in "a suit against a third-party who is entitled to absolute indemnity by

the debtor on account of any judgment that might result against them in the case[, t]o refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute." *Id*. at 999.  That is precisely the situation here.  Mr. Sherman has an absolute right of indemnity against the Debtors, and as such, "[t]o refuse application of the statutory stay" as against Mr. Sherman "would defeat the very purpose and intent of the statute."  Accordingly, the Court should extend the automatic stay to enjoin prosecution of the LaSurk Action against Mr. Sherman.

### C.    Mr. Sherman's Status as a Co-Insured with Debtors Requires Extension of the Automatic Stay to Him

It is not only the Debtors' indemnification obligations to Mr. Sherman that require the extension of the automatic stay to actions against him.  The Debtors' insurance Policy, under which Mr. Sherman is a co-insured, also require the same result.

As noted above, Mr. Sherman is a co-insured under the Policy.  *See* Ex. J (Policy), at § II.17.A.3-4, p.5 and Named Insured Endorsement.  Moreover, the Policy provides an overall aggregate limit of $10 million, and any coverage extended to any Insured reduces the overall amount of coverage available to the other Insureds.  *See id*. at Item 4, Declarations, p. 3, and § III.A.8, p. 14.  Thus, any coverage provided to Mr. Sherman will necessarily reduce the amount of coverage available to the Debtors.  As such, if the LaSurk Action moves forward against Mr. Sherman and he is ultimately held liable, any insurance coverage to which he is entitled will deplete the Debtors' estates by reducing their insurance coverage.

In addition, under the Policy, defense costs also draw down on the aggregate limits of coverage.  *See id*. at § III.A.10, p. 14.  The LaSurk Action, which was filed on June 3, 2016, is subject to the Policy.  *See* Ex. D.  Thus, any coverage to which Mr. Sherman is entitled for his costs in defending the LaSurk Action will *also* reduce the aggregate amount of coverage available

to the Debtors – that is to say, will reduce the size of the estates.[9]

The Second Circuit has squarely and repeatedly accepted the argument that claims which deplete the debtor's insurance coverage should be stayed.  Most recently, and most pointedly, the Second Circuit held in *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012), that insurance policies under which the debtor and a non-debtor are co-insureds constitute valuable property of the estate, and accordingly, where litigation against the non-debtor "would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate . . . the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."  *Id.* at 58.  *Queenie* also expressly provided that one of the situations favoring extension of the automatic stay is "a claim against the debtor's insurer."  321 F.3d at 287 (citing *Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.)*, 26 B.R. 420, 435-36 (Bankr. S.D.N.Y. 1983)); *see also Robins*, 788 F.2d at 1001-02 ("actions 'related to' the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled to indemnification under such policy or who qualify as additional insureds under the policy are to be stayed under section 362(a)(3)").

Accordingly, this Court should extend the automatic stay to bar prosecution of the LaSurk Action against Mr. Sherman as a co-insured under the Debtors' Policy.

**D.     Defending the LaSurk Action Would Improperly Distract Mr. Sherman's Attention Away From Efforts to Resolve the Bankruptcy**

Courts have long recognized that "actions against principals [are properly] enjoined where their time and energy [i]s important to the rehabilitation of a debtor's business."  *Lazarus Burman Assocs. v. Nat'l Westminster Bank USA (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 898 (Bankr.

---

[9] The Policy at issue here includes a self-insured retention feature, but that is of no moment to this analysis:  any defense cost that does not create an insurance obligation (i.e., self-coverage under the self-insured retainer) instead creates an indemnification obligation against the Debtors in favor of Mr. Sherman, which supports the argument in the foregoing section.

E.D.N.Y. 1993).  That is because, if outside litigation were permitted to continue, "key personnel would be distracted from participating in the reorganization process causing [the debtor] and its creditors both immediate and irreparable harm."  *In re Lomas Fin. Corp.*, 117 B.R. 64, 67 (S.D.N.Y. 1990).  Thus, the stay is regularly extended where external litigation would cause "an immediate adverse economic consequence," *Queenie*, 321 F.3d at 287, because an employee "is key to the restructuring and to the business and [] both would suffer irreparable harm if he were distracted from his responsibilities in order to participate in the [external] litigation."  *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 412 (S.D.N.Y. 2007); *see also Rosetta Res. Operating LP v. Pogo Producing Co. (In re Calpine Corp.)*, Nos. 05-60200 (BRL), 06-1757 (BRL), 2007 Bankr. LEXIS 2025, at *14 (Bankr. S.D.N.Y. Apr. 30, 2007) (extending automatic stay in part because outside litigation would cause a potential "distraction of key employees to the urgent task of reorganization"); *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06 Civ. 5358, 2006 U.S. Dist. LEXIS 92499, at *6 (S.D.N.Y. Dec. 20, 2006) (affirming extension of stay where "if allowed to proceed, the [State Court] Action will place serious litigation demands [on] the Debtor['s] senior management and personnel and will distract them from the reorganization").  Notably, courts extend the automatic stay in such situations regardless of whether the successful resolution of the bankruptcy case would be through a reorganization or an asset sale.  *See In re United Health Care Org.*, 210 B.R. 228, 232 (S.D.N.Y. 1997) (extending the stay is justified where non-stayed litigation "would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort," in the context of an agreed-upon Chapter 11 dissolution).

In this case, allowing the LaSurk Action to proceed against Mr. Sherman would compromise the Debtors' chances for a successful Chapter 11 plan confirmation.  Mr. Sherman,

as CEO of the Debtors, must give continuous, intense and significant attention ***now*** to these Chapter 11 Cases.  With a marketing and due diligence process just starting which seeks to attract strategic operator bidders for the Debtors' facility businesses, Mr. Sherman's undivided attention is critical.  The serious demands that defending the LaSurk Action would impose on Mr. Sherman's time, efforts, and attention would preclude Mr. Sherman from giving the Debtors and their sales the attention required.  Mr. Sherman remains the Debtors' CEO, so the best outcome is that Mr. Sherman be free to devote his time and best efforts towards maintaining the Debtors' operations, supporting marketing efforts, and ensuring a smooth transition to new owners.  To the extent Mr. Sherman's time and efforts are diverted to defending the LaSurk Action, he will not be able to abide by his commitment to focus his attention on these tasks.  The distraction of Mr. Sherman by the LaSurk Action's prosecution will compromise the best sales result and, therefore, undermine the best possible economics for creditors.

Even if there were only the LaSurk action to contend with, the Debtors would still be concerned about the distraction a trial would cause.  These concerns, however, are multiplied because of the potential for numerous follow-on state court actions which might move forward as well.  At present, approximately 30 Pending Actions against Debtors, similar to the LaSurk Action, also name Mr. Sherman as an individual defendant under Public Health Law § 2808-a.  As of now, none of those Pending Actions other than the LaSurk Action are approaching trial, and plaintiffs in the vast majority of those cases appear to be abiding by the automatic stay.  But if an extension of the stay is denied here, it is very likely that plaintiffs in those other cases (nearly all of whom are represented by the same counsel) will seek to push those cases forward as against Mr. Sherman as well – meaning that the denial of a stay here is likely to divert Mr. Sherman's time and attention almost entirely, because he will no doubt find himself defending not one, but thirty, state court

actions.

Even worse, it is likely that Mr. Sherman and his counsel will be required to mount this defense alone, unaided by the Debtors, who are in reality the primary defendants in all of these cases, but against whom these numerous plaintiffs cannot proceed.  Mr. Sherman and his counsel will thus be forced to leverage the Debtors' resources in support of his own defense, such as obtaining the Debtors' books and records to use as evidence and potentially employees of the Debtors to appear as witnesses.  Already this sure drain on the Debtor resources causes concern.  But the only alternative – that the Debtors waive their rights under the automatic stay and come to the aid of Mr. Sherman – is worse.  That outcome would entirely defeat the operation of the automatic stay and render these Chapter 11 Cases a shambles.  Either way, if the LaSurk Action and potentially other Pending Actions were allowed to proceed, "then the Congressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code." *Robins*, 788 F.2d at 999.

In sum, requiring Mr. Sherman to defend himself in the LaSurk Action at this time would impede the ongoing operation of the Debtors' businesses and would sabotage the successful resolution of these Chapter 11 Cases.  Accordingly, the automatic stay should be extended to prohibit Plaintiff from prosecuting the LaSurk Action against Mr. Sherman.

## III.    THE COURT SHOULD ALSO ENJOIN PROSECUTION OF THE LASURK ACTION AGAINST MR. SHERMAN UNDER § 105(a)

Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," and provides this Court with broad, equitable powers to "assure the orderly conduct of the reorganization proceedings."  11 U.S.C. § 105(a); *see Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987) (citing *Baldwin*, 765 F.2d at 348).  Thus, in addition to extending the automatic

stay under § 362, this Court should also "enjoin suits that might impede the reorganization process" and which would not otherwise be automatically stayed. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93 (2d Cir. 1988); *see also Kagan v. Saint Vincents Catholic Med. Ctrs. (In re Saint Vincents Catholic Med. Ctrs.)*, 581 F. App'x 41, 43 (2d Cir. 2014) ("the bankruptcy court acted within its authority when it stayed [a] state court action pursuant to its equitable powers under § 105(a)" in order "to assure the orderly conduct of the reorganization proceedings" and to prevent "the specter of direct impact on the *res* of the bankrupt estate" (citations omitted)); *Quigley*, 676 F.3d at 58 (affirming "the exercise of bankruptcy jurisdiction to enjoin . . . suits" under § 105(a) where the suits "would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate").  Preliminary injunction motions are governed by Federal Rule of Civil Procedure 65, as modified by Federal Rule of Bankruptcy Procedure 7065.

In determining whether to grant a preliminary injunction under § 105(a), courts consider: (1) whether there is a reasonable likelihood of successful resolution of the bankruptcy process; (2) whether there would be imminent irreparable harm to the estate and the bankruptcy process in the absence of an injunction; (3) whether the balance of harms tips in favor of the movant; and (4) whether the public interest favors an injunction.  *See Lazarus Burman*, 161 B.R. at 901; *In re Soundview Elite Ltd.*, 543 B.R. 78, 118-19 (Bankr. S.D.N.Y. 2016); *In re Lyondell Chem. Co.*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009); *Rosetta*, 2007 Bankr. LEXIS 2025, at *8.

All four of these factors support the issuance of an injunction here.  First, as noted above, it seems likely that these Chapter 11 Cases will be successfully resolved – if, among other things, Mr. Sherman is not prevented from meeting his agreed-upon obligations to devote his time and best efforts to overseeing the Debtors' operations through the marketing and due diligence process, followed by a sale and transition to new ownership.  Although the successful resolution is likely

to occur through one or more asset sales rather than through a traditional reorganization, that is a distinction without a difference – courts do not limit this analysis to a reorganization only, as opposed to any other type of successful resolution. *See United Health Care*, 210 B.R. at 234 (finding the "Reasonable Likelihood of a Successful Reorganization" factor satisfied: "As the parties have announced that they have reached an agreement to settle this case, it appears that a successful 'reorganization' – or, in this case, a Chapter 11 liquidation – is likely to occur."). Moreover, the ultimate identity of the owner is not nearly as important to this analysis as the fact that the nursing home facilities, which are the Debtors' key operations, should remain substantially in operation. That status supports the higher sales price typically achieved by assets sold as a going concern, but can be achieved here only if Mr. Sherman remains involved and undistracted.

Second, there would be imminent irreparable harm to the Debtors' estates and the Chapter 11 Cases in the absence of an injunction, for reasons substantially similar to those described in Section II above. Those reasons include the fact that a finding of liability against Mr. Sherman under Public Health Law § 2808-a necessarily operates as a finding of liability against the Debtors as well; that proceeding with the LaSurk Action against Mr. Sherman will deplete the assets of the estates through the operation of Debtors' indemnification obligations towards Mr. Sherman and through the drawing down of the insurance Policy under which the Debtors and Mr. Sherman are co-insureds; and the fact that the LaSurk Action will significantly divert Mr. Sherman's time and attention from his responsibilities towards overseeing the Debtors' operations and the resolution of the bankruptcy process.

Third, for substantially the same reasons, the balance of harm solidly favors an injunction. Plaintiff is seeking only a money judgment against Mr. Sherman and is not seeking any time-sensitive relief; accordingly, if an injunction is issued, a delay of the LaSurk Action as against Mr.

Sherman would not prejudice Plaintiff.  This reasoning is squarely in line with *Hawaii Structural,* which concluded that "if the injunction does not issue, the debtor will suffer real harm," but that "[t]here is no concomitant harm that will befall the . . . plaintiffs[] in a delay of the State Court Action."  2006 U.S. Dist. LEXIS 92499, at *18.  And staying the LaSurk Action would preserve the estates' assets and facilitate an equitable resolution of claims in the bankruptcy, which is to the benefit of all stakeholders.  *See In re G-I Holdings, Inc.,* 295 B.R. 211, 216 (D.N.J. 2003).

Finally, the public interest here favors an injunction.  An injunction would promote the strong interest in allowing the Debtors to resolve their liabilities through a centralized and rational resolution of claims in bankruptcy, as well as the public interest in achieving such a resolution through a consensual process.  *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 453 (1999).  Even more importantly, however, by facilitating a resolution of the bankruptcy in a manner that permits most of the Debtors' nursing home facilities to continue to operate smoothly and efficiently – as opposed to in the haphazard manner that would surely result from the diversion of Mr. Sherman's attention to numerous state court matters and the failure of his obligation to oversee the Debtors' operations and smooth transition – is clearly in the public interest, as it would allow these facilities to continue providing their important services to the ill patients in their care.

Accordingly, for all these reasons, this Court should also issue an order enjoining Plaintiff from prosecuting the LaSurk Action against Mr. Sherman under § 105(a).

## **CONCLUSION**

For the reasons set forth above, the Court should enter an order (1) preliminarily enjoining prosecution of the LaSurk Action by Plaintiff therein pending a determination on the remainder of this motion; (2) declaring that prosecution of the LaSurk Action by Plaintiff therein as against defendant Mr. Sherman violates the automatic stay that is currently in place; (3) extending the

automatic stay to encompass and enjoin the prosecution of the LaSurk Action as against Mr. Sherman pursuant to Bankruptcy Code § 362; or (4) enjoining the prosecution of the LaSurk Action as against Mr. Sherman pursuant to Bankruptcy Code § 105; and (5) award to the Debtors any such further relief as the Court may deem just, proper, and equitable.

Dated: New York, New York
      December 17, 2019

By:   */s/ Schuyler G. Carroll*
      **LOEB & LOEB LLP**
      Schuyler G. Carroll
      William M. Hawkins
      Evan K. Farber
      Mary Jean Kim
      345 Park Avenue
      New York, New York 10154
      Tel. (212) 407-4000

      *Counsel for the Debtors*