WOODS OVIATT GILMAN LLP                         **Hearing: 1/13/2020  11:00 AM**
William F. Savino
*Co-Counsel for Mark LaSurk,*
*As Administrator of the*
*Estate of Rhonda LaSurk*
1900 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 248-3200

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
_____

In re:                                          Chapter 11

ABSOLUT FACILITIES MANAGEMENT                   Case No. 19-76260 (AST)
LLC, et. al,                                    et. al.

                          Debtors               (Jointly Administered)
_____

ABSOLUT FACILITIES MANAGEMENT                   A.P. No. 19-8155 (AST)
LLC, et al.

                          Plaintiffs,

v.

MARK LASURK AS ADMINISTRATOR
OF THE ESTATE OF RHONDA LASURK,

                          Defendant.
_____

### MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' MOTION TO ENFORCE OR EXTEND THE AUTOMATIC STAY OR FOR INJUNCTIVE RELIEF ON BEHALF OF NON-DEBTOR ISRAEL SHERMAN

### PRELIMINARY STATEMENT

The Defendant, Mark LaSurk ("LaSurk") is the Administrator of the Estate of Rhonda

LaSurk who died on March 4, 2015, a resident of Absolut at Orchard Park, LLC ("Absolut-

Orchard Park").  LaSurk opposes the Debtors' request for imposition of a stay of a pending

action, LaSurk v. Absolut Center for Nursing & Rehabilitation at Orchard Park, Absolut Facilities Management, LLC and Israel Sherman, Erie County Index No. 804925 ("State Court Action") filed against non-debtor Israel Sherman ("Sherman") individually for the following reasons:

A. The State Court Action against non-debtor, Sherman, is based on his own liability as a "controlling person" as defined in Public Health Law §2808-a for the death and injury to Rhonda LaSurk, a former resident of one of the Debtor nursing homes. Adjudication of the claim by LaSurk will not have an "immediate adverse economic consequence" against the Debtor; the claim is made against the individual non-debtor and would be satisfied from the non-debtor's own resources.

B. The contention that the Debtors will contractually indemnify Sherman is not enforceable as a matter of public policy, and would, at most, add to the unsecured claims against the Debtors to be paid pro-rata but would not affect the estate.

C. The contention that Sherman's status as co-insured is irrelevant to prosecution of the State Court Action.

D. Sherman is not managing those remaining operating nursing homes, and prosecution of the State Court Action would not divert Sherman's attention or have any impact on the bankruptcy proceedings in which all assets will sold in a liquidation.

E. Adjudication of liability and damages against Sherman could not bind the Debtors under principles of collateral estoppel.

F. There is no basis for preliminary injunctive relief under 11 U.S.C. §105.

As described in the Complaint and Amended Complaint in the State Court Action,[1] Rhonda LaSurk was admitted to Absolut-Orchard Park on about October 21, 2013. In the year and a half of her residency at the nursing home, Ms. LaSurk suffered various injuries including development and worsening of pressure sores, significant conscious pain and suffering, and deprivation of dignity and rights, until her untimely death as a result of the negligence of the nursing home and the reckless disregard of her lawful rights.

Subsequent to the bankruptcy filing of the six Absolut entities on September 10, 2019, Absolut-Orchard Park closed its operations (Wyse Dec. ¶7). The remaining five operating debtor- nursing homes are scheduled to be sold at public auction pursuant to an Order entered on December 18, 2019 (ECF Doc. No. 323).  ¶¶4 and 5 and in the Organizational Chart annexed as Exhibit A to the Declaration of  Michael Wyse filed 9/11/2019 (ECF Doc. No. 15), Sherman is the sole manager of Absolut Facilities Management LLC ("Absolute Management") and holds a 100% interest in Absolute Management.   Absolute Management manages each nursing home entity.  Each of the nursing home entities including Absolut-Orchard Park are New York limited liability companies in which Sherman holds a 45% membership interest.  Sherman is "CEO" and an employee of each nursing home

Sherman has agreed to facilitate the sale process by assisting (providing "cooperation") in various licensure applications by the successful bidders.  For this he will be compensated $592,500.00. Wyse Decl. 9/11/19, ECF Doc. No. 269, ¶19; Wyse Decl. ECF Doc. No. 2, Exh. C.

The State Court Action was commenced on June 3, 2016, more than two years prior to the bankruptcy filing.  Discovery has been completed, and a Note of Issue was filed on March 28, 2019.  On December 17, 2019, the State Court entered an Order for severance of the co-

[1] Copies of these pleadings are annexed as Exhibits D and E to the Declaration of Michael Wyse filed December 17, 2019 (ECF Doc. No. 2-1) in the Adversary Proceeding ("Wyse Decl.").

defendant debtors, Absolut-Orchard Park and Absolut Facilities Management, LLC, to allow trial

to proceed against the non-debtor, Sherman.    A copy of the State Court severance Order is

annexed to the opposing Declaration of Michael Scinta,

The causes of action asserted in the State Court Action are: First Cause of Action (against

all defendants including Sherman) based on common law negligence; Second Cause of Action

(against all defendants including Sherman) based on common law wrongful death; Third cause

of Action based on deprivation of rights and benefits pursuant to Public Health Law §2801-d and

2803-c; Fourth Cause of Action based on deprivation of dignity; and a Fifth Cause of Action

under 42  U.S.C. §1395y(b)(2)(C) for recovery of Medicare expenses.

The Amended Complaint (filed July 10, 2019) identifies Sherman as a "controlling

person" pursuant to New York Public Health Law §2808-a which provides in pertinent part:

> 1.    Every person who is a controlling person of any residential
> health care facility liable under any provision of this article to any
> person or class of persons for damages or to the state for any civil
> fine, penalty, assessment or damages, shall also be liable, jointly
> and severally, with and to the same extent as such residential
> health care facility, to such person or class of persons for damages
> or to the state for any such civil fine, penalty, assessment or
> damages.
>
> 2.    For purposes of this section, a "controlling person" of a
> residential health care facility shall be deemed to mean any person
> who by reason of a direct or indirect ownership interest (whether
> of record or beneficial) has the ability, acting either alone or in
> concert with others with ownership interests, to direct or cause the
> direction of the management or policies of said facility.

As noted, the Wyse Decl. admits at ¶¶4-5 that (a) Sherman is CEO of each nursing home

entity; (b) he is the sole manager of Absolut Management which manages each nursing home

entity; (c) Sherman holds a 100% membership interest in Absolut Management; (d) Sherman

holds a 45% limited liability membership interest in Absolut-Orchard Park as well as each of the

nursing home entities.   Sherman, thus,   meets the criteria of ownership and control of management as provided in Section 2808-a(2).

Shortly prior to State Court Action being called for trial, the Debtors filed the instant motion and an Adversary Proceeding seeking a determination that the State Court Action against non-debtor, Sherman, is stayed pursuant to Section 362 of the Bankruptcy Code or that it should be stayed because (A) any judgment against non-debtor Sherman allegedly will have an "immediate adverse economic consequence" on the Debtor, citing  Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282 (2d Cir. 2003); (B) non-debtor Sherman is contractually indemnified by the Debtors;  (C) non-Debtor Sherman is a co-insured; and (D) defending the litigation would divert the attention of non-debtor Sherman  from the Debtors' reorganization efforts.   Additionally, the Debtors seek injunctive relief pursuant to 11 U.S.C. §105 because the State Court Action would ostensibly impede the reorganization.

## ARGUMENT

## POINT I

### THERE ARE NO UNUSUAL, RARE OR EXTRAORDINARY CIRCUMSTANCES WHICH WOULD REQUIRE IMPOSITION OF THE AUTOMATIC STAY AS TO NON-DEBTOR LIABILITY IN THIS LIQUIDATING BANKRUPTCY CASE

It is "well settled that stays pursuant to §362(a) are limited to debtors and do not encompass non-bankrupt co-defendants." Teachers Ins. & Annuity Assn. of Am., 803 F.2d 61, 65 (2d Cir. 1986).  The Second Circuit has recognized, however, that "the automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." Queenie, 321 F.3d at 287. In the Eastern District, JSO Assoc. v. Awrey Bakeries, LLC, 2014 U.S. Dist. LEXIS 87249,*5 (E.D.N.Y. 6/25/2014) likewise held that  the automatic stay "ordinarily does not extend to non-

bankruptcy codefendants."   The Bankruptcy Court in <u>In re SDNY 19 Mad Park</u>, LLC, 2014 Bankr. LEXIS 3877, * 4 (Bankr. S.D.N.Y. 9/11/2014). Held that "the grant of a motion staying an action against a debtor's principal, however, is extraordinary relief."   In <u>Gray v. Hirsh</u>, 230 B.R. 239, 243 (S.D.N.Y. 1999), the Bankruptcy Court held that a "non-debtor can claim the protection only in 'unusual circumstances,'" and "the broader rule here is that a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's reorganization." 230 B.R. at 243.  <u>Gray v. Hirsh</u> cautioned: "Limited or theoretical risk must be insufficient, however, or else the <u>Teachers Ins. & Annuity Ass'n</u> rule against extending stays to officers and principals would be eviscerated." 230 B.R. at 244.

Here, there is no proposed reorganization.  All the assets of the Absolut Debtors will be sold at auction.   While Sherman has agreed, according to the supporting Declaration of Wyse, to assist the buyers in obtaining licenses, he will be paid $592,500.00 for his "assistance and cooperation and to facilitate the transfer of operations of the Facilities." Wyse Decl.  ¶ 14 and Wyse Exh.C, ¶ 18-21.   A stay of the LaSurk State Court Action would provide direct and immediate benefit to Sherman, individually, rather than benefit to any reorganization or to avert harm to the estate.   <u>CAE Industries, ltd. v. Aerospace Holdings Co</u>., 116 B.R. 31 (S.D.N.Y. 1990) cautions that "In the absence of evidence which demonstrates any impact upon the debtor's reorganization effort, the stay cannot be extended to a solvent co-defendant . . . ."  116 B.R. at 34.

Further, in <u>In re Pitts</u>, 2009 Bankr. LEXIS 40123 (Bankr. E.D.N.Y. 12/9/2009), this Court concurred with the state court's determination that the severance of a non-dischargeabilty action to allow the claim to proceed against the non-debtor did not violate the automatic stay and that <u>Queenie</u> did not apply where rehabilitation was not being pursued:

> In our case, there is no risk to any reorganization if the stay is not extended to the Corporate Defendants because the Debtor is liquidating. The imposition of liability against the Corporate Defendants only serves to fix liability against the Corporate Defendants at this point, and will not hamper the bankruptcy proceedings pending before this Court. In fact, there is no evidence that the continuation of State Court Action post-petition had any effect on the Debtor's bankruptcy case as the Debtor was severed from the State Court Action.

2009 Bankr. LEXIS 4023, * 19

Here, the State Court Action against Sherman is based on his status as "controlling person" under Public Health Law §2808-a. In <u>Ocean Side Institutional Indus. v. United Presbyterian Residence</u>, 254 A.D.2d 337 (2d Dep't 1998), the Second Department affirmed the dismissal of a complaint for damages under Section 2808-a against the President of the Receiver of a nursing home because he had no economic interest in the Receiver, and, thus, was not a "controlling person." The Second Department explained:

> As amended in 1976, the statute defines "controlling person" to mean "any person who by reason of a direct or indirect ownership interest . . . has the ability . . . to direct or cause the direction of the management or policies of said facility. (Public Health Law §2808-a[2]). Legislative history reveals that the requirement that an individual have an ownership interest in order to be deemed a **"controlling person" was imposed "to insure that liability and responsibility follow the capability to make a profit**" (Mem of State Exec Dept 1976 McKinney's Session Laws of NY, at 2342)

254 A.D.2d at 338 (Emphasis added).

The District Court for the Eastern District of New York has also considered the independent liability of controlling individuals to "PACA" claimants. In <u>JSO Assocs. v. Awrey Bakeries, LLC</u>, the plaintiff, seller of perishable commodities, commenced an action against the bakery and its owner based the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §499e(c), based on non-payment of invoices for the sale of perishable goods. While the District

Court action was pending, the bakery filed a bankruptcy petition in the District of Delaware.  The plaintiff moved to sever the action to continue the suit against the individual defendant.

The District Court for this District ruled that "where a non-debtor codefendant may be held <u>independently</u> <u>liable</u> of the debtor, then there is no compelling basis by which a court must extend the automatic stay provisions to §362 to the non-debtor co-defendants," 2014 U.S. Dist. LEXIS 87249, * 6 (Emphasis added), and that the individual defendant, Awrey, a non-debtor could be held liable under PACA if he was in control of the PACA trust assets:

> The Second Circuit has recognized that 'an individual who is in a position to control the assets of the PACA trust and fails to preserve them, may be held personally liable to the trust beneficiaries for breach of fiduciary duty' [citing Coosemans Specialties, Inc. v. Garguilo, 485 F.3d 701, 703 (2d Cir. 2007)].

2014 U.S. Dist. LEXIS 87249, * 6. The District Court held:

> Therefore, plaintiff need not wait for the conclusion of the bankruptcy proceedings before seeking recovery directly from Awrey. Moreover, as a result, the bankrupt corporation would not be adversely affected should plaintiff succeed against Awrey, and there is no basis to extend the automatic stay to non-debtor Awrey.

2014 U.S. Dist. LEXIS 87249, * 7-8.  The District Court also noted that "although the issues of law and fact are intertwined, should plaintiff succeed against Awrey, plaintiff would not be entitled to double recovery for the unpaid produce." Id.

The Debtors argue that Sherman's liability as a "controlling person" is so "intertwined" with the Debtor that the State Court Action is effectively against the Debtor.   But, as Oceanside Institutional explains, the key to the "controlling person" provision in Section 2808-a is that the defendant must have an ownership interest which could direct management of the facility and that the statute was intended "**to insure that liability and responsibility follow the capability to make a profit.**"  254 A.D.2d at 338 (Emphasis added).  Thus, liability as a controlling person

stems, not because of imputation by reason of status, but, rather, because the controlling person of the nursing home has made the cynical decision to make a profit instead of attending to the needs of the nursing home residents.

Liability under Section 2808-a is no different than the liability of the individual owner of the Awrey Bakery in <u>ISO Assoc., supra</u>, in which the Eastern District held that PACA liability flows to the individual owner because he was in a position to control the bakery's assets, and the bakery did not pay for the perishable products. The Eastern District Judge held that severance of the action was appropriate after the bakery filed its bankruptcy case, and that the automatic stay would not be applied to the individual owner who had become personally liable for breaching his fiduciary duty by reason of non-payment for the perishable products. "Therefore, plaintiff need not wait for the conclusion of the bankruptcy proceedings before seeking recovery directly from Awrey." 2014 U.S. Dist. LEXIS 87249, * 7-8.   As described in <u>A.H. Robbins</u>, "the nondebtor's liability rests upon his own breach of duty." 788 F.2d at 999.

In this District, it is clear that a stay "should not be extended where the non-debtor is independently liable as, for example, whether the debtor and another are joint tortfeasors or where the non-debtor's liability rests upon his own breach of duty." <u>Hernandez v. Immortal Rise, Inc</u>., 2014 U.S. Dist. LEXIS 33823 (E.D.N.Y. 3/13/2014) (denying a stay in litigation against a non-debtor joint employer in a claim under the Fair Labor Standards Act ["FLSA"]).   Sherman's liability as "controlling person" under Section 2808-a is based on his right to control funds of the nursing home and derive a profit instead of providing adequate care for the residents of the nursing home, i.e., Sherman's breach of his own duty.  Imposition of a stay to benefit such a non-debtor is simply not warranted or permitted.

Finally, the District Court in <u>Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC</u>, 2014 U.S. Dist. LEXIS 136152 (S.D.N.Y. 9/25/2014) cautioned:

> Courts should also consider whether such an extension would work
> a hardship on plaintiffs, by giving an unwarranted immunity from
> suit to solvent co-defendants.

2014 U.S. Dist. LEXIS `136152, *5.

In <u>Le Metier</u>, the plaintiff commenced an action for securities fraud and breach of fiduciary duty in the District Court, and while the action was pending, the business entity defendant filed a Chapter 11 case.  The Bankruptcy Court appointed a Chapter 11 Trustee and ordered a sale of the assets.   The District Court noted that it had the jurisdiction to determine whether the automatic stay should be extended to a non-debtor individual defendant and found that there was an insufficient showing for such extraordiary relief.

Here, the State Court Action places at risk Sherman's own assets, not the Debtors' assets. Debtors have not asserted any economic hardship to Sherman, and, indeed, as conceded by Wyse, Sherman stands to earn $592,500 for his purported "cooperation" in assisting the successful bidders at the auction sale to obtain state licenses.  The stay benefits only Sherman individually, and continued prosecution of the State Court Action has no "immediate adverse economic harm" to the estates of the Debtors.

## POINT II

### SHERMAN HAS NO MANAGEMENT ROLE WITH THE DEBTOR, AND HIS PERSONAL PARTICIPATION (IF ANY) IN THE STATE COURT ACTION WILL NOT AFFECT THE BANKRUPTCY PROCEEDINGS

The Debtors' complaint for injunctive relief and their motion to impose the automatic stay attempt to portray Sherman's role as "unique and indispensable" (Wyse Decl. page 5).  But

Sherman's management role with the Debtors is non-existent. Management of the remaining operating nursing homes is under the control of Michael Wyse, Chief Restructuring Officer and Lorry Dotter, Chief Operating Officer, who "is responsible for all aspects of operations of the Debtor's facilities" (Declaration of Michael Wyse, ECF Doc. No. 15, Schedule 11, Senior Management, page 77).

Although Wyse notes that Debtors' day to day operations "require attentive and continued hands-on management" of the skilled nursing and assisted living facilities, Wyse is careful not to represent Sherman as having any role in management or operations, let alone day-to-day or "hands-on" management.

The Wyse Declaration notes that the Debtor recently added personnel, Phillip Hoffman, William K. Lenhart, and Wyse. The Schedule of Senior Management annexed as Schedule 11 to the Wyse Declaration filed 9/11/2019 identified Senior Management to include Lenhart, as Independent Advisor, Wyse as Chief Restructuring Officer, Hoffman as Interim Chief Financial Officer, and Larry Dotter as Chief Operating Officer "responsible for all aspects of operations of the Debtors' facilities." The Wyse Declaration states in a conclusion that Sherman "is truly the key to the Debtor's operation" (Wyse Decl. ¶12). Tellingly, however, Wyse, does <u>not</u> describe Sherman's role in any operational capacity. Rather, according to the conclusory statement of Wyse, "Sherman's relationships allow him to ensure the cooperation of employees and continued quality of care."[2] Wyse Decl. ¶14    Further, as noted, Sherman will supposedly provide his

---

[2] In <u>Passucci v. Absolut Center for Nursing and Rehabilitation et al</u>, 2014 N.Y. Misc. LEXIS 5834 (Sup. Ct. Erie Co. 1/10/2014) aff'd 125 A.D.3d 1313 (4th Dep't 2015), the trial court denied class certification in an action brought against all the Absolut entities. The class certification motion was supported by 89 affidavits of residents, former residents, employees, and family members regarding extreme deficiencies of care. The Fourth Department affirmed the trial court's determination that such deficiencies had to be adjudged against each nursing home individually based on the particular circumstances. Plaintiff's Amended MOL p. 8 admits that there are 30 other pending actions against the Debtors similar to the action commenced by LaSurk. The fact that there are dozens of such claims and lawsuits based on extreme deficiencies of care evidence Sherman's neglect and mismanagement, rather than "continued quality of care." See Declaration of Michael C. Scinta.

assistance in connection with Change of Ownership Applications (Wyse Decl. ¶14) and, as set forth in the Sale Order and in the Settlement Agreement, Wyse Decl. Exh. C, Sherman will be paid $592,500.00 for his efforts.

The most that Wyse can muster is a conclusory statement that requiring Sherman to engage in the litigation  will "diver[t] his attention away from his duties under the Settlement Agreement and from maintaining the Debtor's operations, supporting marketing efforts, and ensuring a smooth transition to new owners." (Wyse Decl. ¶ 15).

Absolut-Orchard Park closed post-petition (Amended MOL p. 5) leaving five operating nursing homes.  Any documentation required by Plaintiff from Absolut-Orchard Park already has been produced in discovery, and depositions have been taken that will be used at trial. See Wyse Decl. Exh. G in which LaSurk's attorney advised debtors' counsel that it was LaSurk's intention "to offer certified business records, in anticipation of the scheduled trial as against non-debtor defendant Israel Sherman."  To the extent that a discrete employee (assuming one of the former Absolut-Orchard Park employees is still employed by the Debtor) may be subpoenaed for trial will cause no disruption of the Debtors and does not violate the automatic stay.

While some cases have extended the automatic stay to non-debtors over similar concerns, these cases are generally large, complex cases with large numbers of potential claimants. In <u>A.H. Robbins</u>, there were many thousands of lawsuits which absorbed the time and energies of officers and executives in preparing for and attending trials. 788 F.2d at 995.  In denying such stay relief in this District, in <u>FPSDA II, LLC v. Larin (In re FPSDA I, LLC)</u>, 2012 Bankr. LEXIS 5928, *51 (Bankr. E.D.N.Y. 2012), Judge Dorothy Eisenberg observed:

> Moreover, here, Debtors have presented virtually no specific information concerning the nature and extent of the burdens that would be placed on Smith if he is forced to defend the Larin Case. The A.H. Robins court had ample information before it to address

these concerns and to determine that letting the subject litigation go forward would materially hinder the reorganization. See id. at 999-1007. This Court, by contrast, does not.

Therefore, absent a more thorough and specific showing by the Debtors, this Court cannot find that the Debtors are more likely than not to show, by clear and convincing evidence, that Smith would be so burdened by his defense of the Larin case that his ability to manage the Operating Debtors' affairs would be undermined, to the material detriment of the ongoing reorganization here.

The conclusory assertions by Wyse in no way proffer clear and convincing evidence of any burden which Sherman purports he would undertake in defense of the State Court Action against Sherman or how it would disrupt his "cooperation" and thereby jeopardize the $592,500.00 he stands to be paid.

The Debtors also raise the specter that the estimated 30 other pending actions against the Debtors which remain inactive may become emboldened by any success of LaSurk.  (Amended MOL p. 21-22) This is immaterial, and does not serve as clear and convincing evidence of a need for a stay of the LaSurk State Court Action, which stands only to benefit non-debtor, Sherman. Simply, whether or not the stay is extended to Sherman, the Debtors will continue to be afforded the protection of the automatic stay—even in the LaSurk State Court Action, which has been severed as to the Debtors.


# POINT III

## SPECULATION THAT THE STATE COURT ACTION AGAINST
## THE NON-DEBTOR SHERMAN MAY BIND THE DEBTORS IS UNFOUNDED

The Debtors argue that a finding of liability against Sherman under Section 2808-a would "necessarily entail a finding of liability against the Debtors." (Amended MOL p. 15). That is not

true.  In Queenie  the Second Circuit rejected such a potential offensive collateral estoppel as a basis for a stay:

> We have not located any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision.  If such apprehension could support application of the stay, there would be vast and unwarranted interference with creditor's enforcement of their rights against non-debtor co-defendants.

321 F.3d at 288.  The Second Circuit's conclusion has been borne out in the succeeding sixteen years.  Thus, in N.J. Carpenters Health Fund v. Royal Bank of Scotland Group, PLC, 564 B.R. 192 (S.D.N.Y. 2016), the District Court denied a motion to extend the automatic stay to non-debtors based on an alleged preclusion by the pending litigation:

> Nor is the Court persuaded by speculation that a judgment here 'would potentially have preclusive effect' on the Debtor Defendants (Underwriter Def's July 27 Ltr. 3.)  The Court is not persuaded that collateral estoppel—the fear that a future Court will conclude that Debtor Defendants are bound by an adjudication on the merits in this court-is even arguably implicated here, given that the Debtor Defendant's bankruptcy has deprived them of a full and a fair opportunity to litigate the claims against them in this forum at this time.  See Parklane Hoisery Co. v. Shore, 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("In both the offensive and defensive use of collateral estoppel, the party against whom estoppel is asserted has litigated and lost in an action.")

564 B.R. at 195.

The District Court went on to cite to the ruling by the Second Circuit in Queenie that there is no collateral estoppel effect which might affect the Debtor.

Likewise, the Bankruptcy Court in In re SDNY 19 Mad Park, LLC, supra, denied the extension of the automatic stay to the non-debtor principal for a claim arising under the New York Labor Law and FLSA for failing to pay tips and overtime to the plaintiff.  The Bankruptcy Court denied relief to the non-debtor and held, in part, "the possibility of the offensive use of

collateral estoppel in this case does not justify extending the stay to him, as the Circuit Court held in Queenie." 2014 Bankr. LEXIS 3877, * 5.

In the State Court Action against Sherman, any verdict could not serve as preclusion in a subsequent claim against the Debtors particularly since the Debtors would not have had a full and fair opportunity to litigate the claim by reason of the bankruptcy stay. Thus, the speculation that an adjudication against Sherman would prejudice the Debtors is unfounded.

The continued prosecution of the State Court Action would have absolutely no "immediate adverse economic impact" against the estate.

### POINT IV

### THE ALLEGED CLAIM FOR INDEMNIFICATION
### IS NOT A BASIS FOR A NON-DEBTOR STAY

#### A. AN INDEMNIFICATION CLAIM ALONE
#### IS NOT A BASIS TO APPLY THE AUTOMATIC STAY

An alleged claim for indemnification, standing alone, is not a basis for application of the automatic stay. In Ochs v. Lipson (In re First Cent. Fin. Corp.), 238 B.R. 9 (Bankr. E.D.N.Y. 1999) this Court held that

> Even with the right to indemnification . . . the magnitude of the harm to the debtor if no stay is in force does not approach the scope of the potential injuries besetting the debtors in Robbins and Johns-Manville. . . .
>
> Here, mass litigation is non-existent, there is no reorganization effort which would require the participation of the Officers and Directors, and no discernable harm can be ascribed to the Debtor if the Officers and Directors ultimately file claims for indemnification in this Chapter 7 case. The Trustee is arguing semantics. He asserts that the Officers' and Directors' indemnification demand may eventually be filed in this case, but we are mystified as to how this constitutes harm to the Debtor.
>
> **Further, we are unconvinced that potential indemnification demands would damage the estate. Although claims for indemnification filed in this Chapter 7 liquidation might lessen**

**the overall pro rata distribution to creditors, such distributive adjustment does not damage the estate.** Cf. Louisiana World, 832 F.2d at 1400 ("There is not the potential for increasing the estate's exposure by payment of liability [insurance] proceeds due.") A potential for additional claims in this case, without more, does not constitute 'unusual circumstances' which would necessitate imposition of the automatic stay upon the Lipson Action.

238 B.R. at 20 (Emphasis added).

Likewise, in <u>Le Metier Beauty Inv. supra</u>, in which there was a liquidating Chapter 11 case,  the District Court held that "although a claim by Blanch [non-debtor] for indemnification might lessen the overall percentage of a pro rata distribution to creditors, such distributive adjustment does not damage the [Debtor's] estate." 2014 U.S. Dist. LEXIS 136152, * 11, citing <u>First Cent. Fin. Corp. supra</u>.

Sherman's claim for indemnification arises, if at all, pre-petition.[3]  Thus, any such indemnification would <u>not</u> be entitled to an administrative priority, but, at best, is simply an unsecured claim against the Debtors (as would LaSurk's claim).  <u>In re Amfesco Industries, Inc</u>. 81 B.R. 777, 784 (Bankr. E.D.N.Y. 1988). Thus, any potential indemnification to Sherman by the Debtor might affect pro-rata distributions to creditors but would have no effect on the estate itself.

In <u>In re SDNY 19 Mad Park, LLC, supra</u> the Bankruptcy court concluded that "the possibility that Magliulo has indemnification rights against the Debtor does not tip the balance in favor a stay." 2014 B.R. LEXIS 3877, *4 and that

The fact that a Debtor may have to indemnify a third-party is alone not a sufficient basis to extend the automatic stay to that party because the justification for extending the stay 'must be consistent with the purpose of the stay itself [which is] to suspend actions that pose serious threat to a corporate debtor's reorganization efforts.'

---

[3] Indeed, on December 24, 2019, Sherman filed multiple proofs of claim as an unsecured creditor against the debtors on the basis of indemnification.

2014 B.R. LEXIS 3877 *5.

Here, a potential indemnification claims would simply affect the pro-rata distribution to unsecured creditors and could not affect the bankruptcy estate, particularly where no rehabilitation is being pursued.

### B. PUBLIC POLICY PRECLUDES INDEMNIFICATION FOR LIABILITY UNDER PUBLIC HEALTH LAW 2808-a

The District Court in <u>SDNY 19 Mad Park, supra,</u> also notes that there may be challenges to the right to indemnification and cities to <u>Goodman v. Port Authority of N.Y. and N.J.</u> 850 F.Supp.2d 363 (S.D.N.Y. 2012) which held that indemnification for violation of a FLSA claim was against public policy:.

> This Court is in agreement that a holding that the Indemnification clause is enforceable would indeed mean that employers would have little reason to be concerned over . . . [compliance] with the statutorily mandated and unwaivable overtime pay requirements of the FLSA, knowing full well that if they are later found to have violated such requirements, such employers would be totally compensated for any injuries resulting from such action.

850 F. Supp.2d at 388-389 (citations omitted).

In <u>Herman v. RSR Sec. Servs.</u>, 172 F.3d 132 (2d Cir. 1999), the Second Circuit held that an employer has no right of indemnification or contribution for violations of the FLSA. In <u>Herman</u>, the defendant chairman of the board was held that have "possessed the power to control the workers in question . . .with an eye to the 'economic reality' presented by the facts of each case," 172 F.3d at 139, and, thus, was held liable for statutory damages for failure to pay employees a minimum wage. The Second Circuit held that the defendant's claims for indemnification and contribution were denied because the FLSA was enacted for the benefit of

employees and constituted "a comprehensive remedial scheme as shown by the express provision for private enforcement in certain carefully defined circumstances." 172 F.3d at 144. Thus, the Second Circuit held that there was no right to indemnification for employers held liable under the FLSA.

The Public Health Law likewise provides a comprehensive remedial scheme and imposes liability under Section 2808-a  against a "controlling person" which is co-extensive with liability of the health care facility, <u>Niagara Mohawk Power Corp v. Salerno</u>, 20 A.D.3d 142 (4th Dep't 2005).

The liability of the "controlling person" under Section 2808-a is not simply imputed, but it is based on the person's controlling economic interest in the nursing home and his or her decision to make a profit rather than attending to the needs of the nursing home residents  i.e. "**to insure that liability and responsibility follow the capability to make a profit."**  <u>Ocean Side Institutional</u>**,** 254 A.D.2d at 338 (Emphasis added).  Just as in the <u>Goodman</u> decision cited above, a "controlling person" under Section 2808-a would have no incentive to apply the profits of the nursing home to the proper care of its residents if he or she could simply be indemnified by the nursing home for his or her breach of duty of care. Such an application of the rule would subvert the purpose of the "controlling person" provision and be against public policy.

Section 2808-a is part of a comprehensive remedial scheme which would be thwarted if a "controlling person" such as Sherman could simply foist off all of his liability for the harm caused to nursing home residents by the mechanism of indemnification.

## POINT V

## THE STATUS OF INSURANCE COVERAGE IS NOT
## RELEVANT TO CONTINUATION OF THE STATE COURT ACTION

The Debtors contend that since Sherman is a co-insured under certain of the Debtor's insurance policies, any coverage in the LaSurk Action will reduce the aggregate amount of coverage available to the Debtors  (Amended MOL p. 19.)    Although Debtors cite to In re Quigley Co., 676 F.3d 45 (2d Cir. 2012) sustaining a bankruptcy court's injunction against actions which drew down on insurance policies , 676 F.3d at 58, that sentence was directed to the bankruptcy court's jurisdiction in matters of direct or derivative liability.  Quigley pertained to an asbestos action and a channeling injunction where an insurance trust had been established for current and future asbestos claimants consistent with Section 524 of the Bankruptcy Code. The Debtors' reliance on Quigley is not as broad as the Debtors proffer.  (The holding of Quigley was that lawsuits by third-parties based on a Pennsylvania statute were not barred by the Bankruptcy Court's injunction of prosecution of non-debtor suits.)

Here, the Debtors have not established a trust or an insurance trust for creditors, they have no committed funds (including insurance coverage) to pay claimants such as LaSurk, and any stay of the State Court Action would be based on speculation that adequate insurance coverage (if at all) may be available for claims by LaSurk against the non-debtor or whether the carrier will disclaim coverage or assert exclusions.  Indeed, Amended MOL p. 11 admits that the Policy "imposes a limit on coverage for each claim or occurrence of $1,000,000" with an aggregate cap of $10 million.  If, indeed, there are 30 pending claims for negligence by the nursing homes (and claims for "controlling person" liability against Sherman), then the available coverage will be insignificant.

Likewise, the Debtors' citation in passing at Amended MOL p. 19 to <u>Johns-Manville Corp.</u>, 26 B.R. 420, 435 (Bankr. S.D.N.Y. 1/23/1983) pertained to suits against insurance carriers.  On reargument, the Bankruptcy Court in <u>Johns-Manville</u> concluded that "Staying third party direct actions against Manville's insurance carriers will insure uniform treatment of all asbestos related health claimants." 26 B.R. at 436.  In McArthur Co. v. Johns-Manville Corp., 837 F.2d 89 (2d Cir. 1988), the Second circuit reiterated that the Johns-Manville injunctive orders "were necessary to effectuate the Court's channeling authority, that is, to make sure that the claims to Manville's insurance proceeds were, in fact, channeled to the settlement fund and could not be asserted directly against the insurers."  837 F.2d at 93.

LaSurk has not commenced a direct action suit against an insurance carrier, and, indeed, under <u>Lang v. Hanover Ins. Co.</u>, 3 N.Y.2d 350 (2004), no direct action may be commenced by an injured party, and, in any event, there is no assurance that insurance would cover anything.

Third parties regularly seek relief from the automatic stay against debtors to liquidate claims subject to insurance coverage under <u>In re Sonnax</u>, 907 F.2d 1280 (2d Cir. 1990). Thus, in <u>Westchester Fire Ins. Co. v. Delta Airlines, Inc. (In re Int'l Total Servs.</u>), 2006 U.S. Dist. LEXIS 60989 (E.D.N.Y. 8/28/2008), the District Court in this District affirmed the Bankruptcy Court's order granting relief from the automatic stay to allow Delta Airlines to liquidate its claim that was covered by insurance. The District Court cited to <u>Colliers</u> on Bankruptcy:

> Actions which are only remotely related to the case under title 11 or which involve the rights of third parties often will be permitted to proceed in another forum. . . . **Where the claim is one covered by insurance or indemnity, continuation of the action should be permitted** since hardship to the debtor is likely to be outweighed by hardship to the plaintiff.

2006 U.S. Dist. LEXIS 60989, *3 (Emphasis added).

Unlike <u>Quigley</u>, there is no statutory asbestos-type trust created by the Absolut Debtors. Unlike <u>Johns-Manville</u>, there are not 15,500 suits pending against the debtors (26 B.R. at 435). Unlike either decision, LaSurk has not commenced a direct action against any insurance carrier.

The theoretical contention that defending the LaSurk action will result in reduction of the aggregate (and insignificant) amount of insurance coverage available for other claimants is simply not material.  LaSurk's suit is against Sherman, not the Debtors.    Whether Sherman has his own insurance coverage is no different than any other defendant who is sued for such damages.    Further, disclosure of insurance coverage to a jury in a negligence action is not relevant and generally prejudicial and reversible error. <u>Salm v. Moses</u>, 13 N.Y.3d 816, 818 (2009).

Thus, the potential availability of insurance coverage on behalf of Sherman as co-insured is insufficient to warrant imposition of the stay of the State Court Action.

## POINT VI

### THERE IS NO BASIS FOR INJUNCTIVE RELIEF

Although Debtors have filed a complaint for injunctive relief pursuant to 11 U.S.C. §105(a), there is no cognizable harm by the continuation of the State Court Action.  In <u>In re Pitts</u>, <u>supra</u>, this Court held that:

> The court may only issue such injunctive relief if the court finds that "the debtor would suffer some cognizable prejudice if the injunction did not issue," . . . and that the burden is on the moving party to show by clear and convincing evidence that injunctive relief is warranted.

2009 Bankr. LEXIS 4023, * 23.

The Debtor's conjecture of harm caused by the continuation of the State Court Action does not rise to a clear and convincing level.

In <u>Picard v. Fairfield Greenwich, Ltd.</u>, 762 F.3d 199 (2d Cir. 2014), the Second Circuit recognized the power of the bankruptcy court to grant relief pursuant to Section 105 but declined to decide an "issue of first impression" as to the appropriate test for injunctive relief citing to the economic harm test of <u>Queenie</u> and the test of <u>Winter v. NRDC, Inc.,</u> 555 U.S. 7, 20 (2008) i.e., "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips his favor, and that an injunction is in the public interest".)  Rather, the Second Circuit concluded that Plaintiff Trustee failed to meet either the preliminary injunction test or the "immediate adverse economic harm" test:

> We conclude that the Trustee is incapable of establishing either that the settlements would in fact have an "immediate adverse economic consequence" for the BLMS estate, id., or that the estate "is likely to suffer irreparable harm in the absence of preliminary relief.

762 F.3d at 212

In <u>In re Pick-Your-Own, Inc</u>., 2019 Bankr. LEXIS 3604 (Bankr. W.D. N.Y. 2019), the Bankruptcy Court noted that most courts have applied the "usual preliminary injunction standard," 2019 Bankr. LEXIS 3604, *8.  Applying both tests (the <u>Queenie</u> test and the <u>Winter</u> test) the Bankruptcy Court concluded that the Debtor failed to show danger of imminent, irreparable harm which would require enjoining the suit against a non-debtor guarantor, and how the continued litigation against the non-debtor "is legally certain to have an adverse impact on property of the estate." <u>Id</u>.  Rather, "the mere possibility that a third-party action will have some effect on a debtor's estate is not enough to satisfy either the <u>Queenie</u> or <u>Winter</u> standards."  2019 Bankr. LEXIS 3604, *4.  Similarly, the Bankruptcy Court held that "[t]he mere prospect of harm

to the Debtor is not enough—the Debtor must show harm to be "'likely' and not merely 'possible.'" 2019 Bankr. LEXIS 3604,*4.

Here, the Debtors reiterate the erroneous contention that a finding of liability against Sherman will operate as a finding of liability against the Debtors.  Because the Debtors will have no full and fair opportunity to defend, they cannot be exposed to collateral estoppel.  Any indemnification which Sherman may seek would simply be, at best, an unsecured claim without harm to the estate itself.  Insurance coverage is not material to LaSurk's claim, and LaSurk has not brought an action against the carrier. Sherman has no meaningful management responsibility for the remaining five operating nursing homes, and the Wyse Declaration, in conclusory terms, fails to proffer necessary detail of how such diversion of time and attention would harm the debtor.

The Debtors argue that the LaSurk is not time-sensitive presumably meaning Rhonda LaSurk died. Nonetheless, further delay serves no purpose, harms the LaSurk estate while providing no benefit to the Debtors' estate.

Finally, there is no public interest in delaying the State Court Action which would adjudicate liability against Sherman who cynically favored profit over providing sufficient resources to care for nursing home residents such as Rhonda LaSurk who suffered greatly from neglect and mismanagement of Sherman's nursing home.

## CONCLUSION

For these reasons, defendant LaSurk requests denial of the Debtor's motion in all respects, together with such other relief as is just and equitable.

Dated: Buffalo, New York
      January 6, 2020

<div style="margin-left:40%">

Respectfully,

WOODS OVIATT GILMAN LLP

</div>

By:    _s/ William F. Savino_____

<div style="margin-left:45%">

William F. Savino
Bernard Schenkler
*Co-Counsel for Mark LaSurk, as Administrator*
*for the Estate of Rhonda LaSurk*
1900 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 248-3200

and

BROWN CHIARI, LLP
Michael C. Scinta
*Co-Counsel for Mark LaSurk, as Administrator*
*for the Estate of Rhonda LaSurk*
2470 Walden Avenue
Buffalo, New York  14226
(716) 681-7190

</div>